In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3671

United States of America,

Plaintiff-Appellee,

v.

Lucky Irorere,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 245-2--Harry D. Leinenweber, Judge.


Argued May 19, 2000--Decided September 26, 2000


Before Flaum, Chief Judge, and Manion and Williams,
Circuit Judges.

Flaum, Chief Judge.  Defendant Lucky Irorere
appeals his conviction of conspiring to import
heroin in violation of 21 U.S.C. sec. 952(a), 21
U.S.C. sec. 963, and 18 U.S.C. sec. 2, as well as
his conviction of importing heroin in violation
of 21 U.S.C. sec. 952(a) and 18 U.S.C. sec. 2.
The defendant argues that the evidence presented
at trial was insufficient for a jury to convict
him of conspiring to import heroin and importing
heroin and that the district court erred in
refusing to explicitly instruct the jury that the
defendant had to have knowledge of the foreign
origins of the heroin in order to be convicted of
both charges. The defendant also contends that
the district court erred in refusing to appoint
a lawyer to represent him at sentencing and in
denying his motion for a new trial based on
statements made by his alleged co-conspirators
during their plea colloquies. In addition, the
defendant claims that the indictment issued
against him was void because it allegedly lacked
the signatures of the grand jury foreperson and
an attorney for the government. For the reasons
stated herein, we affirm the district court.

I.  Background

     The charges of which the defendant was
convicted stem from an extensive investigation of

drug trafficking between Thailand and the United States. As part of this operation, the Drug Enforcement Administration ("DEA") placed Mark Lasyone, a cooperating source, in Thailand. Lasyone was eventually introduced to several members of a purported drug trafficking organization, including Haas David Kalusha, also known as Nicholas Onaro, and Onaro's girlfriend, Thiamchan Chiawan.

As part of the drug trafficking investigation in which Lasyone was participating, DEA agents Anthony Thomas and Jeff Johnson posed as Lasyone's contacts in the United States. In addition, the DEA office in Chicago obtained an undercover fax number and two undercover postal addresses to be used as a point of receipt for heroin shipped to the United States. Once these undercover addresses were established, Lasyone informed Onaro that he could arrange locations in the United States that could accept delivery of heroin and subsequently notified Onaro of the existence of the two undercover postal addresses.

Following Onaro's receipt of the undercover postal addresses, two separate shipments of heroin were sent to the United States. On January 22, 1998, a package containing 289.9 grams of heroin arrived at one of the undercover addresses following the receipt of a fax from "David," an alias of Onaro's, indicating that the "samples" had been shipped. A second package containing 310.7 grams of heroin arrived at one of the undercover postal addresses on March 24, 1998. The defendant contacted Agent Thomas shortly after the arrival of both of these shipments.

On March 30, 1998, Chiawan traveled to the United States where she met Agent Thomas, whom she believed to be Lasyone's son-in-law. Agent Thomas and Chiawan planned to deliver the heroin, obtain payment for it, and return to a nearby hotel to meet Lasyone. On the same day that Chiawan arrived in the United States, the defendant contacted Lasyone to inform him that everything had arrived. Although the defendant arranged a meeting between himself, Agent Thomas, and Chiawan for March 31, 1998, that meeting was rescheduled for the following day at the request of the defendant.

After the defendant cancelled the March 31, 1998 meeting, Lasyone became dissatisfied with the defendant's handling of the drug transaction. On April 1, 1998, Lasyone telephoned Onaro to complain about the defendant's conduct. Shortly after this call, Agent Thomas and Agent Johnson arrived at Chiawan's hotel to meet with the defendant. The agents met the defendant in the hotel lobby and then proceeded to Chiawan's room

where the defendant and Agent Thomas discussed payment arrangements. When Agent Thomas expressed concern over the defendant's failure to produce any money in payment for the heroin shipment, the defendant responded that he had a long-standing relationship with Onaro and that Agent Thomas should call Onaro to discuss it with him.

In an attempt to break the impasse over the method of payment for the drugs, Agent Thomas called Lasyone and arranged for Lasyone to telephone Onaro. When Agent Thomas informed the defendant that Lasyone was going to contact Onaro, the defendant stated that he had been surprised by Agent Thomas's request for immediate payment and that he would be prepared next time. The defendant also said that he had talked to Lasyone at least twice and that no one had ever mentioned money.

After speaking with Agent Thomas, Lasyone telephoned Onaro in Thailand and complained that the defendant had not brought any money with him to the exchange. Although Onaro agreed that it was Agent Thomas's decision as to whether the transaction would proceed, Agent Thomas eventually relented and decided to go forward without payment in advance. Agent Thomas then sent Agent Johnson to retrieve a package that was purportedly filled with heroin. When Agent Johnson returned, the package was shown to the defendant and placed in the defendant's duffel bag. The defendant was arrested as soon as he took possession of the heroin.

Following his arrest, the defendant waived his Miranda rights and gave a post-arrest statement to the government. In that statement, the defendant said that he was first contacted by an associate who gave him Onaro's phone number and who told him that David in Thailand was trying to contact him. The defendant also described various aspects of the heroin shipment from Thailand to the United States and admitted that he traveled to Chicago to pick up the drugs that Onaro sent from Thailand.

On October 12, 1999, the defendant was convicted of conspiring to import heroin in violation of 21 U.S.C. sec. 952(a), 21 U.S.C. sec. 963, and 18 U.S.C. sec. 2, as well as importing heroin in violation of 21 U.S.C. sec. 952(a) and 18 U.S.C. sec. 2. Based on these convictions, the defendant was sentenced to one hundred months in prison. The defendant now appeals, alleging various errors on the part of the district court during both the guilt and sentencing phases of trial.

II. Analysis

A. Sufficiency of the Evidence

At trial, the defendant made a motion for a judgment of acquittal, arguing that the government did not present sufficient evidence to prove beyond a reasonable doubt that he conspired to import the heroin in question or that he imported it. "Challenging the sufficiency of the evidence is an uphill battle and the defendant bears a heavy burden." United States v. Wallace, 212 F.3d 1000, 1003 (7th Cir. 2000). In reviewing the defendant's sufficiency of the evidence claim, "[w]e consider the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor." United States v. Frazier, 213 F.3d 409, 416 (7th Cir. 2000). As an appellate court, we will not reweigh the evidence presented or second-guess the jury's credibility determinations. See United States v. Alcantar, 83 F.3d 185, 189 (7th Cir. 1996) ("Questions of witness credibility are reserved for the jury, and its assessment will not be second-guessed by an appellate panel."); United States v. Hubbard, 22 F.3d 1410, 1415 (7th Cir. 1994). "'Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.'" United States v. Lundy, 809 F.2d 392, 396 (7th Cir. 1987); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979) (stating that the test for the sufficiency of the evidence is "whether . . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (emphasis in original).

Initially, we want to emphasize that the evidence presented at trial was clearly sufficient to establish that the defendant's participation in Onaro's drug trafficking activities was more substantial than the kind of buyer-seller relationship that this Court has rejected as the basis for a conspiracy charge. See United States v. Lechuga, 994 F.2d 346, 349 (7th Cir. 1993) (en banc) (holding that evidence of a mere buyer-seller relationship does not support a conspiracy charge). As early as February 16, 1998, more than a month before the heroin at issue was mailed to the United States, the defendant mentioned his relationship with Onaro to Agent Thomas and alluded to the proposed heroin deal. The defendant admitted of his ongoing relationship with Onaro during subsequent conversations with DEA agents when he stated that he knew "David" and that he had been working with him, and Onaro's willingness to allow the defendant to sell the drugs on consignment reflects the existence of a prior and ongoing relationship of trust, a fact which can be evidence of a conspiracy, see United States v.

Ferguson, 35 F.3d 327, 331 (7th Cir. 1994) ("[E]vidence of providing [drugs] 'up front' may establish the existence of a conspiracy . . . because it indicates cooperation and trust rather than an arm's length retail-type sale."). This evidence is sufficient for a rational jury to find that the defendant both agreed to participate in the relevant heroin transaction and assisted in that transaction, and we therefore reject the defendant's sufficiency of the evidence claim insofar as he contends that he participated in the transaction only as a buyer of the heroin once it reached the United States.

The fact that the government established the defendant's participation in the heroin transaction as more than a buyer is significant, but the defendant does not focus on that aspect of the crimes of conviction. Rather, the defendant's sufficiency of the evidence challenge centers on the state of mind element of the crime of importation. As the defendant correctly points out, both the conspiracy charge and the government's aiding and abetting theory of liability for importation require a showing of specific intent. See United States v. Andujar, 49 F.3d 16, 20 (1st Cir. 1995) (stating that a conspiracy conviction requires both "'intent to agree and intent to commit the substantive offense'") (quoting United States v. Garcia, 983 F.2d 1160, 1165 (1st Cir. 1993)); United States v. Labat, 905 F.2d 18, 23 (2d Cir. 1990) (noting that aiding and abetting requires specific intent to bring about the commission of a crime). In order for the jury to find the defendant guilty of importation, the government must establish that the defendant knew that the drugs in question originated outside the United States. See Seventh Circuit Federal Jury Instructions: Criminal 392-93 cmt. (1999) ("Although the statute itself contains no intent requirement, the cases also make clear that the statute is a specific intent statute which requires the government to prove both that the defendant knowingly imported the substance in question and that the defendant knew the substance was a controlled substance.") (citing cases). According to the defendant, it is his knowledge of the imported nature of the drugs that the government failed to establish at trial.

It is clear that the government has the burden of demonstrating beyond a reasonable doubt that the defendant knew the drugs were imported. However, the government need not establish the elements of the conspiracy and importation charges through direct evidence in order to satisfy its burden of proof. See United States v. Pagan, 196 F.3d 884, 889 (7th Cir. 1999) ("Conspiracy . . . may be proved entirely by

circumstantial evidence."); United States v. Coleman, 179 F.3d 1056, 1061 (7th Cir. 1999) (stating that an individual's guilt under an aiding and abetting theory "'may be established by circumstantial evidence'") (quoting United States v. McKneely, 69 F.3d 1067, 1072 (10th Cir. 1995)). Rather, the government may establish the existence of a conspiracy, and the defendant's involvement in importing heroin, "through circumstantial evidence and any reasonable inferences drawn therefrom involving the defendant['s] relationship, overt acts, and overall conduct." United States v. Castillo, 148 F.3d 770, 774 (7th Cir. 1998).

Contrary to the defendant's assertions regarding the sufficiency of the evidence as to his knowledge of the imported nature of the drugs, there is circumstantial evidence from which a rational jury could conclude that the defendant knew that the heroin in question originated in Thailand. The defendant made several calls to Agent Thomas to discuss various aspects of the heroin transaction, and the content of these calls indicates an awareness of both the details of Onaro's drug trafficking activities and knowledge of Onaro's intent to ship drugs from Thailand to the United States. More significantly, the defendant referred to conversations that he had with Onaro while Onaro was in Thailand and the defendant himself admitted that when Onaro first contacted him he knew that Onaro was mailing drugs to the United States from Thailand. The defendant further knew that most of the principals in this heroin transaction lived and operated out of Thailand. Against this factual backdrop, we cannot conclude that the evidence presented at trial was insufficient to establish that the defendant knew that the heroin he took possession of in the United States originated in Thailand. This evidence, taken together with the testimony and evidence indicating the defendant's involvement in the heroin transaction, is sufficient for a rational trier of fact to conclude that the defendant conspired to import heroin and imported heroin./1 Accordingly, we reject the defendant's sufficiency of the evidence claim.

B.  The Jury Instructions

The defendant next contends that the district court erred in instructing the jury on the necessary elements of the crimes of conspiracy to import heroin and importing heroin. As we stated in connection with the defendant's sufficiency of the evidence claim, both conspiracy and importation require a showing of specific intent. See Andujar, 49 F.3d at 20 (stating that a conspiracy conviction requires both "'intent to

agree and intent to commit the substantive offense'") (quoting Garcia, 983 F.2d at 1165); Seventh Circuit Federal Jury Instructions: Criminal 392-93 cmt. (emphasizing that importation is a specific intent crime); see also Labat, 905 F.2d at 23 (noting that aiding and abetting requires specific intent to bring about the commission of a crime). According to the defendant, the instruction given on the importation offense underlying both of his charged crimes did not adequately express the requirement that the jury find that he knew the drugs he took possession of were imported.

The district court gave the following jury instruction on the importation charge: "To sustain [the charge of importation of controlled substances] against the defendant in Count 3 of the indictment, the Government must prove the following propositions: First, that the defendant imported heroin into the United States from any place outside thereof; and, second, that the defendant knew the substance he possessed was a controlled substance." Although this instruction is modeled on the Seventh Circuit's pattern instruction for a charge under 21 U.S.C. sec. 952(a), see Seventh Circuit Federal Jury Instructions: Criminal 392, the defendant requested that the jury be explicitly informed that in order to convict the defendant of importation it had to find that the defendant knew that the heroin in question originated outside the United States. According to the defendant, such an instruction was necessary because his theory of defense was that although he possessed the heroin once it reached the United States, he was not aware it had been shipped from Thailand. If the jury believed this defense, and had any reasonable doubt as to the defendant's knowledge of the imported nature of the drugs, it would have been required to acquit on both the importation and conspiracy charges. See id. at 392-93 cmt.

Although we believe that the district court's reliance on our pattern instruction was understandable, there are circumstances where the Seventh Circuit pattern instruction on a given charge will be inadequate. According to the defendant, the central problem with the jury instructions in this case is that the defendant's theory of defense--that he possessed the drugs once they arrived in the United States but did not know that they were imported--is not reflected in the pattern instruction on importation. See United States v. Douglas, 818 F.2d 1317, 1322 (7th Cir. 1987) (holding that a model jury instruction can be inadequate in circumstances where the "case . . . involves a theory of defense that is not reflected in that

instruction"). We have previously held that "'[t]he defendant in a criminal case is entitled to have the jury consider any theory of the defense which is supported by law and which has some foundation in the evidence, however tenuous.'" United States v. Boucher, 796 F.2d 972, 975 (7th Cir. 1986) (quoting United States v. Grimes, 413 F.2d 1376, 1378 (7th Cir. 1969)). However, a criminal defendant's entitlement to a theory-of-defense instruction is limited to circumstances where: (1) "the defendant proposes a correct statement of the law;" (2) "the defendant's theory is supported by the evidence;" (3) "the defendant's theory of defense is not part of the charge;" and (4) "the failure to include an instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial." Douglas, 818 F.2d at 1320-21.

The defendant's burden of demonstrating that he was entitled to an instruction on his theory of defense is further complicated by the applicable standard of review. In circumstances where the defendant makes a proper objection, we review a district court's decision regarding the language of a proposed jury instruction for an abuse of discretion, see Spiller v. Brady, 169 F.3d 1064, 1066 (7th Cir. 1999), and its decision not to instruct on a theory of defense de novo, see United States v. Meyer, 157 F.3d 1067, 1074 (7th Cir. 1998). At trial, the defendant did contest the government's proposed instruction and requested that the district court instruct the jury that, in order to convict on the conspiracy and importation charges, it had to determine that the defendant knew the imported nature of the heroin. However, "[m]erely submitting instructions is not sufficient" to preserve an objection. Douglas, 818 F.2d at 1320. Rather, "a defendant must object, on the record, to the judge's refusal to tender the defendant's instructions, and must clearly state the reasons for his or her objections." Id. (citing United States v. Green, 779 F.2d 1313, 1320 n.6 (7th Cir. 1985)); see also Fed.R. Crim.P. 30. Here, the defendant's counsel did not object on the record at the time the district court refused to give the defendant's proposed instruction, but rather accepted the district court's representation that the importation instruction contained an implicit knowledge requirement and confirmed that he could argue a lack of knowledge to the jury. As a consequence of his failure to specifically object to the district court's refusal to offer an explicit theory-of-defense instruction, the defendant has not adequately preserved his objection to the district court's instructions and we therefore review the defendant's challenge under the more deferential plain error standard. Douglas, 818 F.2d at 1320.

As we noted above, there are circumstances where a pattern instruction will be insufficient and where a criminal defendant is entitled to an explicit jury instruction encapsulating his theory of defense. Id. at 1322. However, as we also stated, a defendant is only entitled to such an instruction when his theory of defense is not already adequately captured by the proffered instructions. Id. at 1321. The district court refused to explicitly instruct the jury that the defendant had to know of the imported nature of the heroin because the court believed that this specific intent element was already contained in the pattern instruction on importation. The district court's statement to this effect was apparently accepted by defense counsel, and nothing in the record indicates that the defendant was precluded from presenting his theory of defense to the jury. Although we believe that the district court might have been better served by making the disputed mental state element of importation explicit in the instruction, the defendant's failure to properly preserve his objection renders our review deferential. Absent a more persuasive showing that the pattern instruction on importation did not adequately inform the jury of all the elements of the crime of importation, we cannot conclude that the district court plainly erred in rejecting the defendant's proposed instruction in favor of the pattern instruction.

Our conclusion that the defendant has not demonstrated his entitlement to an explicit jury instruction on his theory of defense is bolstered by the defendant's inability to show that any alleged failure of the district court to give such an instruction deprived him of a fair trial. See id. at 1321 (stating that a defendant is only entitled to a theory-of-defense instruction if the failure to include such an instruction "would deny the defendant a fair trial"). The district court not only delivered an instruction which both parties accepted on the ground that it contained an implied specific intent requirement, but defense counsel was clearly informed that he could argue to the jury that the defendant did not know that the drugs originated in a foreign country. Defense counsel made the most of this opportunity by focusing important parts of his cross-examinations, as well as a significant part of his closing argument, on the defendant's alleged lack of knowledge that the drugs came from Thailand. Moreover, while the importation instruction lacked a specific mental state requirement, both the indictment, which was read and provided to the jury, and the aiding and abetting instruction indicated that the defendant had to knowingly aid in the importation of drugs.

See Trident Investment Management, Inc. v. Amoco Oil Co., 194 F.3d 772, 780 (7th Cir. 1999) (recognizing that "[n]o instructions are perfect, but the rule is that we will not find reversible error in jury instructions if, taken as a whole, they fairly and accurately inform the jury about the law"). Under these circumstances, we are not convinced that the failure of the district court to give an explicit theory-of-defense instruction prejudiced the defendant. Because we conclude that the defendant has not demonstrated that the importation charge given to the jury did not include his theory of defense, and because the defendant has not shown that any oversight that may have occurred in that regard denied him a fair trial, we cannot overturn the district court's decision regarding the jury instructions.

C.  The Defendant's Right to Counsel

The defendant also argues that the district court erred in refusing to provide the defendant a lawyer at his sentencing hearing. It is well-established that "[t]he Sixth Amendment guarantees the right to counsel during all 'critical stages of the prosecution'" United States v. Veras, 51 F.3d 1365, 1369 (7th Cir. 1989) (quoting United States v. Wade, 388 U.S. 218, 238 (1967)), and that this right is applicable during sentencing hearings, see United States v. Ayala-Rivera, 954 F.2d 1275, 1279 (7th Cir. 1992). However, a defendant may waive his right to counsel through his own contumacious conduct. See United States v. Fazzini, 871 F.2d 635, 642 (7th Cir. 1989). In this case, the district court refused to appoint the defendant counsel at his sentencing hearing because the court found that the defendant, through his own conduct, had already frustrated four attempts by the district court to provide the defendant with representation and had thereby waived his right to counsel. Whether the defendant has waived his right to counsel is a practical determination that depends on the particular facts and circumstances of each case, "including the . . . conduct of the accused." McQueen v. Blackburn, 755 F.2d 1174, 1177 (5th Cir. 1985). We review the district court's refusal to appoint counsel for an abuse of discretion, see McNeil v. Lowney, 831 F.2d 1368, 1371 (7th Cir. 1987), and we will not reverse the district court's decision "unless it would result in fundamental unfairness impinging on due process rights," Maclin v. Freake, 650 F.2d 885, 886 (7th Cir. 1981). In order to determine whether the defendant did knowingly and voluntarily waive his Sixth Amendment right to counsel through his own conduct, we must review the facts surrounding the district court's decision not to appoint the defendant counsel for purposes of his sentencing

hearing. The defendant was originally represented by a public defender, Luis Galvan, but Galvan withdrew from this representation because he felt that he did not have a relationship of trust with the defendant and because he regarded the defendant's attitude as abusive and antagonistic. Michael Falconer was then appointed to represent the defendant, but the defendant later requested that Falconer be dismissed as his defense counsel because of Falconer's allegedly poor performance and abusive attitude. In response to the defendant's request for his dismissal, Falconer informed the district court that the defendant would not cooperate with him, and stated that the defendant seemed to feel that he was entitled to an unlimited number of attorneys. During this discussion of Falconer's representation, the defendant first raised the possibility that Galvan could be reappointed and then decided that he wanted to represent himself. The district court advised against proceeding pro se and ordered Falconer to remain as "shadow counsel." The district court also strongly encouraged the defendant to consult Falconer for assistance on the case.

On October 20, 1998, the district court allowed Falconer to withdraw from his representation of the defendant and reappointed Galvan. However, after serving as the defendant's counsel for approximately three months, Galvan again requested to withdraw. In support of this request, Galvan stated that the defendant accused him of "working in conjunction with the government to prejudice [the defendant's] interests" and of lying to him during their consultations. The district court granted Galvan's motion to withdraw and appointed Robert Clarke as counsel for the defendant. Clarke represented the defendant at trial but, after the defendant was convicted, the defendant filed a complaint against Clarke with the Attorney Registration and Disciplinary Commission. Clarke then sought to withdraw as the defendant's counsel and the district court granted Clarke's motion. Following Clarke's withdrawal from the case, the district court asked Carl Clavelli to represent the defendant and delayed the defendant's sentencing date in order to give Clavelli time to prepare for the hearing. The defendant's sentencing date was set for August 19, 1998.

Before the defendant was sentenced, Clavelli filed a motion with the district court seeking to withdraw as the defendant's counsel. During the hearing on this motion, Clavelli informed the district court that he and the defendant had differences of opinion about the case that could not be resolved. At this point, the district

court informed the defendant that it was not going to appoint another lawyer to represent the defendant and that the defendant had the choice of proceeding with Clavelli as his lawyer or proceeding pro se. The defendant resolutely refused to continue with Clavelli as counsel, alleging that Clavelli had treated him abusively and physically attacked him. The district court then granted Clavelli's motion to withdraw and both the defendant and the district court proceeded under the assumption that the defendant was representing himself./2 When the defendant requested new counsel at his sentencing hearing, the district court refused to appoint any further counsel on the ground that the defendant had been uncooperative with his previous counsel in an attempt to drag out his case and in order to provide a basis for appeal. The district court further noted that the defendant had been given the opportunity to proceed with counsel, but through his own conduct had made that impossible. The district court therefore refused to delay sentencing and the defendant was sentenced without the assistance of counsel.

If a criminal defendant seeks to waive his Sixth Amendment right to counsel, he must do so knowingly and intelligently. See Johnson v. Zerbst, 304 U.S. 458, 464-65 (1938). However, "it is not necessary that the defendant verbally waive his right to counsel; so long as the district court has given a defendant sufficient opportunity to retain the assistance of appointed counsel, defendant's actions which have the effect of depriving himself of appointed counsel will establish a knowing and intentional choice." Fazzini, 871 F.2d at 642. The district court appointed four separate lawyers for the defendant, including one of the four twice. All of these lawyers either requested to withdraw because of the defendant's lack of cooperation or were discharged by the defendant, and the district court clearly advised the defendant of the difficulties and dangers of proceeding without the assistance of counsel, see Faretta v. California, 422 U.S. 806, 835 (1975) (stating that a criminal defendant "should be made aware of the dangers and disadvantages of self-representation"). Furthermore, the district court warned the defendant that it would not appoint another lawyer after Clavelli and gave the defendant the option to avail himself of counsel or to proceed pro se. See United States v. Moya-Gomez, 860 F.2d 706, 739 (7th Cir. 1988) ("A criminal defendant may be asked to choose between waiver and another course of action as long as the choice presented to him is not constitutionally defective."). In circumstances such as these, where the defendant's lack of counsel was caused by his own refusal to

cooperate with the counsel appointed for him and where the defendant was made aware of the possible consequences of his refusal to cooperate, the district court's decision not to appoint new counsel for the defendant does not constitute an abuse of discretion. See, e.g., United States v. Harris, 2 F.3d 1452, 1455 (7th Cir. 1993) (finding voluntary and informed waiver where the defendant refused to cooperate with his lawyers and was told that no substitute counsel would be appointed for him).

D.  The Alleged Brady Violation

    The defendant next contends that the district court erred in refusing to grant him a new trial based on the government's alleged failure to comply with its obligation to turn over exculpatory material under Brady v. Maryland, 373 U.S. 83, 87 (1963). According to the defendant, the government violated the requirements of Brady when it failed to disclose to the defendant transcripts of statements made by his co-defendants, Onaro and Chiawan, during their pleas colloquies. The defendant argues that the statements made by Onaro and Chiawan at these plea colloquies were material and exculpatory and that the district court should have granted the defendant a new trial based on the government's suppression of these statements. We review the district court's denial of the defendant's motion for a new trial for an abuse of discretion. See United States v. Kozinski, 16 F.3d 795, 818 (7th Cir. 1994).

    In order for the defendant to show that he is entitled to a new trial because of a Brady violation, he must demonstrate that: "(1) the prosecution suppressed evidence; (2) the evidence allegedly suppressed was favorable to the defense; and (3) the evidence was material to an issue at trial." United States v. Walton, 217 F.3d 443, 450 (7th Cir. 2000); see United States v. Hartbarger, 148 F.3d 777, 786 (7th Cir. 1998). "Evidence is material only if there exists a 'reasonable probability' that its disclosure to the defense would have changed the result of the trial." United States v. Silva, 71 F.3d 667, 670 (7th Cir. 1995); see also Kyles v. Whitley, 514 U.S. 419, 434 (1995) (stating that the "touchstone of materiality is a 'reasonable probability' of a different result"). Put another way, the government's failure to disclose information that the defendant alleges was favorable to the defense constitutes a constitutional violation only if the "supression [of the evidence] undermines confidence in the outcome of the trial." United States v. Bagley, 473 U.S. 667, 677 (1985); see United States v. Asher, 178 F.3d 486, 496 (7th Cir. 1999) ("The

test for materiality of the evidence under Brady is whether, in the absence of the evidence, the defendant received a fair trial resulting in a verdict worthy of confidence.").

The defendant's allegations of a Brady violation focus on the transcripts of testimony given by Onaro and Chiawan during their plea colloquies on September 8, 1998. During the course of both of these colloquies, the government read into the record an extensive factual basis which indicated that both Onaro and Chiawan had participated in a conspiracy to ship drugs from Thailand to the United States and that the defendant was a part of that scheme. However, at the point Onaro was asked if he disagreed with any portion of the facts recited by the government, he responded: "Lucky and the woman, we did not conspire. I didn't know Lucky before. Lucky don't know me before." In addition, when Chiawan was asked if her role in the conspiracy was "to get the heroin and give it to [the defendant]," she denied this role and stated that she "was to come to obtain the heroin" and that "[t]hey asked me to come and pick up the money." According to the defendant, these statements by Onaro and Chiawan were exculpatory and material and should have been disclosed to the defendant.

Although when viewed in isolation the statements cited by the defendant are arguably favorable to the defense, a contextual reading of those statements undermines the defendant's claim as to the exculpatory nature of the evidence. Chiawan's statements simply clarified her own role in the conspiracy and did not bear directly on the defendant's participation. Onaro's statements did partially describe the defendant's role in the conspiracy, but the statements indicated only that Onaro did not know the defendant prior to the beginning of the conspiracy. In light of the ambiguity reflected in these statements, and the overall inculpatory nature of the transcripts, it is not clear that the evidence allegedly suppressed was the kind of material subject to disclosure under Brady. See United States v. Hamilton, 107 F.3d 499, 509 (7th Cir. 1997) (stating that the government need not disclose "every possible shred of evidence that could conceivably benefit the defendant"); see also United States v. Agurs, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

Even if the statements made by Onaro and Chiawan could be construed as favorable evidence that was suppressed by the government, the

defendant's claim of error in regard to the district court's refusal to grant the defendant a new trial faces a more substantial obstacle. When the allegedly exculpatory statements are read in context and in light of the record as a whole, it is clear that the undisclosed transcripts were not material to the defendant's case. The transcripts themselves, as well as the factual basis prepared by the government to which both Onaro and Chiawan assented on the record, provide strong inculpatory evidence that the defendant participated in a conspiracy to import heroin from Thailand. Moreover, in light of the evidence presented at trial, there is little probability that the introduction of the disputed transcripts would have changed the outcome. See United States v. Olson, 846 F.2d 1103, 1118 (7th Cir. 1988) (indicating that the materiality of a particular piece of evidence must be evaluated in relation to the strength of the other evidence adduced at trial). Because the defendant has failed to show that the transcripts he now argues should have been disclosed to the defense were both exculpatory and material, we conclude that the government had no obligation to turn those transcripts over to the defendant and that the district court did not abuse its discretion in denying the defendant's motion for a new trial.

E.  The Indictment

The defendant finally challenges the sufficiency of the indictment returned against him by the grand jury. The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." U.S. Const. amend V. The defendant contends that the indictment issued in this case was defective because it lacked both the signature of the grand jury foreperson and that of an attorney for the government./3 According to the defendant, the failure of the government to prove that the indictment contained these signatures renders the indictment void, and consequently deprives the district court of jurisdiction to try him for his offenses and makes his trial and conviction a nullity. We review the sufficiency of the indictment de novo. See Frank v. United States, 914 F.2d 828, 830 (7th Cir. 1990). "Because of [the defendant's] failure to raise objections to the indictment prior to trial, his indictment should be upheld unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted." United States v. James, 923 F.2d 1261, 1266 (7th Cir. 1991) (internal quotation omitted).

The Federal Rules of Criminal Procedure state

that indictments are to be signed by both the foreperson of the grand jury and by an attorney for the government. See Fed.R.Crim.P. 6(c) ("The foreperson . . . shall sign all indictments."); Fed.R.Crim.P. 7(c)(1) ("[The indictment] shall be signed by the attorney for the government."). However, precedent of the Supreme Court and of this Court indicate that both of these signatures are technical deficiencies that are not necessarily fatal to the indictment. See United States v. Wright, 365 F.2d 135, 137 (7th Cir. 1966) ("[T]he signature of the prosecuting attorney is not an essential part of the information; nor is improper signing of the instrument a defect such as to invalidate it."); Hobby v. United States, 468 U.S. 339, 345 (1984) ("Even the foreman's duty to sign the indictment is a formality, for the absence of the foreman's signature is a mere technical irregularity that is not necessarily fatal to the indictment.") (citing Frisbie v. United States, 157 U.S. 160, 163-165 (1895)). Because the alleged failure of the grand jury foreperson and the attorney for the government to sign the indictment would be mere technical deficiencies, and because the defendant does not allege that the indictment did not adequately inform him of the charges against him or otherwise prejudice his defense, the defendant's challenge to the sufficiency of the indictment is without merit.

III.  Conclusion

     Having found no reversible error in the district court's decisions, we AFFIRM the defendant's convictions and sentence.


/1 In addition to arguing that the evidence was insufficient for a jury to find him guilty of conspiracy to import heroin, the defendant contends that the government failed to present sufficient evidence of his participation in the conspiracy to permit the introduction at trial of hearsay statements made by the defendant's alleged co-conspirators. Specifically, the defendant objects to the admission of a tape-recorded conversation between Onaro and undercover government agents on March 10, 1998, as well as a recording of a conversation between Onaro and a confidential source made on March 31, 1998. We review the district court's determination that the defendant was a member of a conspiracy for purposes of the admission of co-conspirator statements for clear error. See United States v. Rodriguez, 975 F.2d 404, 411 (7th Cir. 1992).

     Ordinarily, a decision as to the admissibility of co-conspirator statements is made according to

a pre-trial proffer. See United States v. Santiago, 582 F.2d 1128 (7th Cir. 1978), overruled on other grounds by Bourjaily v. United States, 483 U.S. 171 (1987). In order to justify the admission of a co-conspirator's statement under Rule 801(d)(2)(E) of the Federal Rules of Evidence, the government must prove "by a preponderance of the evidence . . . that (1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statement(s) sought to be admitted were made during and in furtherance of the conspiracy." Rodriguez, 975 F.2d at 406. In this case, the defendant does not question the government's Santiago proffer, but rather contends that the evidence adduced at trial did not establish by a preponderance of the evidence that he was a member of the conspiracy charged. However, in light of our conclusion that the evidence was sufficient to connect the defendant to the alleged conspiracy, we find this challenge to the admission of Onaro's statements to be meritless.

/2 When a criminal defendant decides to proceed pro se, it is generally advisable for the district court to appoint "shadow counsel" to be available to assist the defendant if needed. See Hall v. Washington, 106 F.3d 742, 751 (7th Cir. 1997). Although the district court did ask Falconer to remain as the defendant's shadow counsel after the defendant initially decided to proceed pro se, the district court did not take any similar action at the time it allowed Clavelli to withdraw. While the district court is not required to appoint shadow counsel, and there is no allegation that the district court's failure to do so in this instance resulted in an unfair process, we urge district courts to appoint shadow counsel in circumstances where a defendant decides to proceed pro se. Such an action not only ensures the availability of counsel to defendants who decide that proceeding without the assistance of counsel is not in their best interest, but also avoids the potential for delay created by untimely assertions of the right to counsel.

/3 Although the defendant contends that the original indictment lacked the signatures of the grand jury foreperson and an attorney for the government, the indictment itself has apparently been lost and is not part of the record on appeal. However, for the purposes of appeal, we will assume arguendo that the indictment in fact lacked the relevant signatures as the defendant claims.