**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued November 14, 2006
Decided December 21, 2006

**Before**

Hon. FRANK H. EASTERBROOK, *Chief Judge*

Hon. RICHARD A. POSNER, *Circuit Judge*

Hon. JOHN L. COFFEY, *Circuit Judge*

No. 05-4085

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>JOSUE BABINES PIMENTEL,<br>*Defendant-Appellant*. | Appeal from the United States District Court for the Southern District of Indiana, Evansville Division<br><br>No.  EV 04-07-CR-05-Y/H<br><br>Richard L. Young,<br>*Judge* |

**ORDER**

A jury found Josue Babines Pimentel guilty of participating in a conspiracy to distribute and to possess with intent to distribute more than 500 grams of methamphetamine and 100 kilograms of marijuana.  Though he concedes that the government adduced enough evidence to establish the existence of the conspiracy, Babines Pimentel argues that there was insufficient evidence from which the jury could reasonably find beyond a reasonable doubt that he was a participant.  We disagree and hold that the government presented evidence sufficient to establish that Babines Pimentel had participated in the conspiracy by helping to disassemble

and reconstruct the cars which were used for shipments of drugs and also by assisting in the selling of drugs. Accordingly, we affirm the judgment of conviction.

**I.**

In November 2003 local law enforcement officials began investigating a group trafficking in large quantities of methamphetamine and marijuana around Vincennes, Princeton, Evansville, and Washington, Indiana. The organization, led by Francisco Ramirez and Alfonso Amaral, had drug suppliers in California and Mexico. During the next several months, police officers, in cooperation with the DEA, conducted undercover operations, executed search warrants, and arrested numerous members of the organization.

Babines Pimentel and his wife were identified by Amaral's girlfriend, Jessica Fox, as associates of Amaral. Fox knew Babines Pimentel as "the mechanic" because he used his skills as an auto mechanic to assist in the disassembling of drug-laden cars when they arrived with the drug shipments from California. Babines Pimentel was taken into custody and later charged with conspiring to distribute and to possess with intent to distribute methamphetamine and marijuana, 21 U.S.C. §§ 846, 841(a)(1), using a telephone to facilitate the distribution of methamphetamine, *id.* § 843(b), and possessing firearms in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i). The government later decided not to pursue the telephone charge.

At trial, the government called several witnesses against Babines Pimentel. Two members of the DEA task force in Evansville, police officer Dennis Holt from Vincennes and state trooper Robert Hornbrook, testified extensively about the police work that led officers to Ramirez and Amaral and the ensuing investigation of their organization. All told, officers had seized at least two kilograms of methamphetamine, 20 firearms, a "lethal explosive device," $50,000 in cash, and four vehicles, resulting in 14 members of the conspiracy being charged with various crimes. Officer Holt also testified about the search of Ramirez's home, where officers found, in addition to about a half-pound of marijuana, an identification card bearing Babines Pimentel's name and photograph.

Jessica Fox, who was likewise charged as part of the conspiracy, was also a witness against Babines Pimentel. She testified that Ramirez went by the name of "Frankie," and Amaral was also known as "Panchie," and they were receiving large shipments of methamphetamine from California about twice per month. The drugs were stashed in vehicles' drive shafts and tires as well as in other parts of the cars. Fox testified that Babines Pimentel, whom she knew at the time only as "the mechanic," assisted Ramirez and Amaral in removing the drugs from the cars. According to Fox, Babines Pimentel worked out of his garage, taking the cars apart

that other members of the conspiracy brought to him.  On cross examination Fox admitted that she never saw Babines Pimentel dismantling cars but that Amaral had told her about it.  Fox also testified that every week Babines Pimentel was "getting ounces, maybe two at the most" of methamphetamine, which he in turn sold.  Fox testified that Amaral would "front" the drugs to Babines Pimentel and give him "a week or less" to make payment.  Fox also described a controlled transaction in which she participated after she began cooperating with the police.  She called Babines Pimentel and spoke to him and his wife about a debt they owed Amaral for fronted drugs.  Babines Pimentel and his wife then came to the house Fox shared with Amaral and gave Fox $1500 in cash, which Fox gave to the police.  The jury heard a recording of the phone calls.

Officer Holt, who was present during Fox's calls to Babines Pimentel, testified that after Babines Pimentel delivered the money to Fox, police officers got a warrant to search Babines Pimentel's home, where the officers discovered methamphetamine, digital scales, plastic bags, a handgun, a rifle, and two shotguns.  They also found a list of phone numbers that included contact information for a "Frank" and a "Panchie" and an "owe sheet," or ledger for keeping track of drug sales.  Officers also searched Babines Pimentel's garage and found two cars, one of which contained paperwork indicating that it belonged to Pablo Echeverria, another indicted member of the conspiracy.

Once in custody, Babines Pimentel was interviewed by police with the assistance of a Spanish translator.  Officer Holt testified that the defendant, after initially claiming to be innocent, eventually admitted that he was assigned by Amaral and Ramirez to perform mechanical work on vehicles that arrived from California containing shipments of drugs.  He related one incident in which Amaral and another man asked him to remove the tail lights from a minivan; they asked that he remove "not just the tail lens cover, but the whole [tail light] assembly."  He did so, and he later observed Amaral and the other man removing "football-shaped" packages from the opening that he had made in the tail light.  Babines Pimentel admitted that he believed the packages contained drugs, although he said he was unsure whether it was marijuana or methamphetamine.  Babines Pimentel also spoke somewhat ambiguously about an occasion when Ramirez brought a car to Babines Pimentel's garage for repairs and removed from the car what Babines Pimentel described as a "hidden spare tire."[1]  Ramirez departed with the tire, and

---

[1] It is unclear from Officer Holt's testimony who removed the tire. Babines Pimentel emphasizes this ambiguity, (Appellant's Br. at 13), but the identity of the person who actually removed the tire matters little given Babines Pimentel's admission that he was present and "working on vehicles."

when he returned, according to Babines Pimentel, "the tire was no longer inflated," suggesting that perhaps Ramirez had removed something from inside the tire.

According to Officer Holt, Babines Pimentel also confessed to dealing drugs. He admitted that Amaral fronted him quantities of methamphetamine, which he later paid for at a rate of $1200 per ounce. Babines Pimentel sold the methamphetamine in small quantities for about $100 per gram. Babines Pimentel also admitted that he had taken the four guns that the police officers had discovered in his home "on trade for methamphetamine." At the close of the government's case-in-chief, Babines Pimentel unsuccessfully moved for a judgment of acquittal, *see* Fed. R. Cr. P. 29(a). The defense did not offer any evidence. The jury found Babines Pimentel guilty of the drug conspiracy and not guilty of the firearms offense.

## II.

On appeal Babines Pimentel argues that there was insufficient evidence to convict him because "the evidence . . . shows that Mr. Babines worked on certain cars, but not in the capacity of a participant in a drug conspiracy." A defendant seeking to overturn a jury verdict for insufficient evidence faces a "daunting" standard. *United States v. Suggs*, 374 F.3d 508, 518 (7th Cir. 2004). We view the evidence and draw all reasonable inferences in the light most favorable to the prosecution and will uphold the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*; *see United States v. Irorere*, 228 F.3d 816, 822 (7th Cir. 2000).

To convict Babines Pimentel of participation in the drug conspiracy, the government had to prove (1) a conspiracy existed; and (2) Babines Pimentel "knew about the conspiracy and chose to participate in it." *United States v. Carrillo*, 435 F.3d 767, 775 (7th Cir. 2006); *see United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003). As Babines Pimentel concedes, "[i]t would be untenable to argue that a conspiracy did not exist," and therefore the only question is whether the government met its burden of proving Babines Pimentel's involvement. Babines Pimentel focuses on his role as "the mechanic" and argues that the evidence shows only that he serviced various automobiles, not that he knowingly participated in the conspiracy. Noticeably absent from his brief is any mention of the evidence that he not only worked on cars, but also directly participated in selling drugs.

Taken as a whole, the evidence was sufficient to allow a rational jury to find Babines Pimentel guilty of participating in the conspiracy. The evidence shows that he was involved in two different ways. First, he used his knowledge of cars to disassemble the vehicles that arrived from California with drugs stashed in them. Second, he dealt drugs. Babines Pimentel argues that Jessica Fox's testimony was

too weak to prove that he knowingly assisted in drug trafficking by working on the cars Ramirez and Amaral brought to him. But we "will not reweigh the evidence presented or second-guess the jury's credibility determinations." *Irorere*, 228 F.3d at 822. Fox—a member of the conspiracy herself—testified that Amaral told her that Babines Pimentel regularly took apart incoming cars from California, and the jury was entitled to credit this testimony. Babines Pimentel's confession corroborates Fox's statement, and no other evidence in the record contradicts it. Babines Pimentel contends that his statement to police proves only that he worked on cars, not that "the parcels indeed contained a controlled substance and that Babines Pimentel was knowingly involved in their extrication." However, this additional step was not required because a particular defendant's involvement in a conspiracy may be established through circumstantial evidence. *Carrillo*, 435 F.3d at 775; *United States v. Miller,* 405 F.3d 551, 555 (7th Cir. 2005). And the circumstances Babines Pimentel described, such as the packages removed from the minivan's tail lights and the tire that Ramirez emptied, support the inference that Babines Pimentel knew he was providing more than run-of-the-mill automotive services. Thus, the jury could reasonably conclude that he knowingly chose to participate in the conspiracy by facilitating the importation of drugs.

Moreover, as Babines Pimentel entirely overlooks in his brief, the government offered evidence that he was involved in the conspiracy as a distributor of drugs as well. Fox's testimony, the evidence discovered at Babines's home, and Babines Pimentel's confession establish that he was selling drugs on an ongoing basis, and, more importantly, that Amaral "fronted" him methamphetamine to sell. Selling drugs on credit is a hallmark of a conspiracy. *See Suggs*, 374 F.3d at 508; *Irorere*, 228 F.3d at 822-23. And Babines Pimentel extended the same favor to some of his customers, as evidenced by ledger recovered from his home. Given the evidence that portrays Babines Pimentel as a participant in the conspiracy on two levels, we can hardly say that no rational jury could have found Babines Pimentel guilty beyond a reasonable doubt.

The judgment of conviction is AFFIRMED.