## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 30 2015, 8:35 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Cynthia M. Carter
Law Office of Cynthia M. Carter, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ryan D. Johanningsmeier
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Thomas W. Burton, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | January 30, 2015 <br><br> Court of Appeals Case No. 41A01-1312-CR-539 <br><br> Appeal from the Johnson Circuit Court <br><br> The Honorable K. Mark Loyd, Judge <br><br> Cause No. 41C01-1305-FB-38 |

**Brown, Judge.**

Thomas W. Burton appeals his convictions for dealing in a schedule II controlled substance as a class B felony, aiding in dealing in methamphetamine as a class B felony, and two counts of dealing in a schedule IV controlled substance as class C felonies. Burton raises six issues which we revise and restate as:

I. Whether the trial court violated his right to counsel;

II. Whether the court abused its discretion in denying his motion for a continuance;

III. Whether the court abused its discretion and violated Burton's confrontation rights by not ordering the State to produce a confidential informant's recent criminal history and not ordering the State to reveal any deals it made with the confidential informant;

IV. Whether the court abused its discretion when it denied Burton's *pro se* Motion for Special Prosecutor to be Appointed;

V. Whether the prosecutor committed prosecutorial misconduct resulting in fundamental error; and

VI. Whether the evidence is sufficient to sustain Burton's convictions for aiding in dealing in methamphetamine and one count of dealing in a schedule IV controlled substance.

We affirm.

## Facts and Procedural History

[2]    In December 2012, Narcotics Detective Travis Wampler with the Johnson County Sheriff's Department, who was a certified substance abuse counselor, had worked as a probation officer, and had been formally trained in conducting covert narcotics buys, became familiar with Confidential Informant 32 ("CI-32"). CI-32 was incarcerated for theft and escape, and he offered to assist in arresting three different targets, none of whom were Burton, in exchange for a reduction in his charges and an early release from jail. A contract to that effect was signed by CI-32 on January 3, 2013. CI-32 ultimately assisted the police with fifty to sixty buys against twenty-seven different dealers.

[3]    On March 15, 2013, after CI-32's contract with the Johnson County Sheriff's Office had expired, CI-32 called Burton to arrange a purchase of methamphetamine. On March 22, 2013, CI-32 arranged to purchase methamphetamine for $120 from Burton at the Tearman Hotel in Franklin, Indiana, and informed Detective Wampler, who was assisted by Johnson County Narcotics Detective Damian Katt. Detective Wampler searched CI-32 prior to conducting the transaction, and CI-32 did not have any narcotics on his person. CI-32 was provided with $200 to purchase methamphetamine and potentially other drugs. Burton drove a white van into the hotel parking lot, and Jeremy Clark accompanied him in the front passenger seat. Burton told CI-32 to enter the driver's-side rear seat of the van, and CI-32 did so. Clark performed the hand-to-hand drug transaction with Burton. Both Detectives Wampler and Katt observed the transaction and video-recorded it. CI-32

returned to Detective Katt after leaving the van without leaving the sight of the detectives and handed Detective Katt two baggies containing a substance which the detectives identified as methamphetamine and which field tested positive for methamphetamine. CI-32 had eighty dollars remaining on his person.

[4] On April 16, 2013, Detective Wampler received a phone call from CI-32 and made arrangements for Detective Katt to transport CI-32 to a Dollar Tree "where the transaction was going to take place in what is know[n] as a 'roving deal or a moving deal.'" Transcript at 193. Detective Wampler "was for safety and security going to monitor the deal" and drove an undercover vehicle, and Detective Katt followed in a second undercover vehicle with CI-32 as the passenger. *Id.* The detectives searched CI-32 prior to the transaction and found no contraband, and they placed a monitoring device, or "keil," on him. *Id.* at 195. CI-32 was given fifty dollars and Detective Katt was given $150 to try to purchase additional narcotics, as well as "a covert-video-recording device" to record the buy. *Id.* at 197. CI-32 purchased twenty Xanax tablets from Burton in exchange for $50 and was recorded by Detective Katt's recording device. Detective Wampler identified the Xanax tablets by drugs.com and the Drug ID Bible. The Xanax tablets were then sealed and submitted to the evidence technician for evidence.

[5] On April 17, 2013, CI-32 called Burton and asked whether he had any prescription medications available for purchase. Burton said that he could obtain Xanax from his sister, who had a prescription for the pills. Burton later called CI-32 and said that he could obtain twenty tablets for three dollars per

tablet, explaining the price by saying that his sister named the price for the pills and was "taxing," which is a term used to explain a high price. *Id.* at 214. CI-32 agreed to pay the money, and Burton told CI-32 the address where they could meet.

[6] CI-32 was searched and subsequently provided with $60 in buy money and a keil, for which Detective Wampler had the keil receiver. Detective Katt drove CI-32 to the house and saw Burton sweeping inside the garage, and Detective Wampler parked a separate vehicle one street over to listen to the purchase via monitoring equipment and to watch the vehicle arrive at the residence. Detective Katt observed CI-32 enter the garage, pick up a small paper-wrapped package lying on a table, and hand money to Burton. CI-32 returned to the vehicle and handed the package to Detective Katt, which contained twenty pills and which Detective Katt recognized, based on having seen such pills "thousands of times," to be Xanax, also known as Alprazolam. *Id.* at 382. Detective Wampler also confirmed the identity of the pills by checking their identification with drugs.com and the Drug ID Bible. The Xanax tablets were placed in an envelope and placed in the evidence property room.

[7] On May 13, 2013, Detective Katt was to transport CI-32 to a residence to meet with Burton and purchase seventeen hydrocodone tablets. The detectives searched CI-32 and provided him with ten dollars which was "a small amount so that he wouldn't have enough money for the purchase." *Id.* at 224. Detective Katt was provided with the remainder of the buy money "so that . . . if the drug deal was going to occur it was going to occur with a cop being

involved." *Id.* Detective Wampler set up across the street from the residence with a camcorder to record the events. Detective Katt eventually exchanged seventy dollars with Burton to purchase seventeen hydrocodone tablets. The detectives and CI-32 then debriefed, and the tablets, which contained "the markings M363 upon them which are specifically hydrocodone tablets," were placed in an evidence envelope. *Id.* at 234. The tablets were later identified as hydrocodone using drugs.com and the Drug ID Bible.

[8] On May 29, 2013, the State charged Burton with Count I, dealing in a schedule II controlled substance as a class B felony; Count II, aiding in dealing in methamphetamine as a class B felony; Count III, dealing in a schedule IV controlled substance as a class C felony; and Count IV, dealing in a schedule IV controlled substance as a class C felony.[1] On June 26, 2013, the Johnson Superior Court No. 2 held an initial hearing and entered an order on the chronological case summary ("CCS") noting that Burton did not request a public defender, that he requested a special prosecutor, and that he requested a speedy trial by jury. The court set a pretrial hearing for August 1, 2013, and a speedy trial date for August 27, 2013. On July 29, 2013, Burton filed a number of *pro se* motions, including "Defendant's Motion to Reveal the Identity of the Confidential Informant – C.I-032," "Defendant's Motion to Reveal Agreement

---

[1] On June 14, 2013, the State filed an amended information charging Burton with Count V, possession of marijuana as a class D felony. Also, on August 7, 2013, the State filed an amended information alleging Burton to be an habitual substance offender. At the pretrial hearing on August 26, 2013, however, the prosecutor moved to dismiss these counts without prejudice, which the court granted.

entered into between the State and the Confidential Informant to testify at trial," and "Defendant's Motion for Prosecution To Reveal Documents on Record of the Confidential Informant – 'C.I-032' Being Approved By a Judge To Be a Valid C.I." Appellant's Appendix at 63-67. That same day the court entered an order taking Burton's *pro se* motions under advisement. On July 31, 2013, Burton filed a *pro se* motion titled "Defendant's Motion for Disclosure of Benefits Provided State's Witnesses and for Disclosure of Exculpatory Evidence." *Id.* at 70.

[9]     On August 1, 2013, Burton filed a "Motion for Special Prosecutor to be appointed," as well as "Defendant's Motion for Conesensual [sic] Interception, and Transmission of Recorded of any Communication of State's Witness." *Id.* at 72, 79. That same day, the court held a pretrial hearing in which Burton requested a public defender, and the court appointed Attorney Carrie Miles to defend him. *Id.* at 4. The court entered an order on the CCS that "[a]ll pending motions filed are set for hearing on August 15, 2013 . . . ." *Id.* On August 6, 2013, Attorney Miles filed a motion to withdraw due to a conflict, and the court entered an order granting the motion. On August 12, 2013, the court entered an order to "transfer this file to another Court by random rotation filing" due to the conflict with Attorney Miles. *Id.* at 89. On August 14, 2013, the Johnson Circuit Court received the case file and set a hearing date for the next day.

[10]    On August 15, 2013, the Johnson Circuit Court held a hearing and at the outset asked Burton if he wanted an attorney appointed to represent him, and Burton responded that he "would like to have an attorney to assist me." Transcript at

3-4. The court inquired what Burton meant by "assist," asking if he wanted an attorney "just to stand by and give you documents if you request it," Burton replied "[s]ure," and the court stated that it did not "allow what we call hybrid or bifurcated representation." *Id.* at 4. The court advised Burton against proceeding *pro se* but noted that it would appoint an attorney as standby counsel if Burton so chose. Burton stated that he would "go ahead and take a public defender at this moment. But I would like it to be duly noted that I don't want no continuances on my behalf." *Id.* at 5. The court appointed Attorney John P. Wilson to represent Burton, and told Burton and Attorney Wilson to confer regarding which, if any, of Burton's *pro se* motions should be pursued. Regarding discovery, the State indicated that it provided discovery to Attorney Miles on August 1, including "copies of the discs, Cd's [sic], the audio recordings and a few others," and the court asked for someone to call her to see if the materials could be turned over to Attorney Wilson. *Id.* at 11-12. The court set a pretrial date of August 26, 2013, and a trial date of August 27, 2013. The court also changed the omnibus date, which had been set for August 31, 2013, to August 26, 2013.

On August 20, 2013, Attorney Wilson filed a motion to withdraw. On August 22, 2013, Burton filed additional *pro se* motions, titled "Motion For Court Order Directing Johnson County Prosecutor's office to Produce the Entire Personnel Files of Detective Travis Wampler & Detective Katt," and "Defendant's Motion For Consensual Interception Transmission and Recording of Communications and For Non-Consensual Electronic Surveillance."

Appellant's Appendix at 101, 103. Burton also sent a letter to the court, which was file stamped August 22, 2013.

[12] On August 26, 2013, the court held a pretrial hearing and questioned Burton regarding Attorney Wilson's motion to withdraw. The court asked Burton if he wanted an attorney to represent him, and Burton responded "I'd like to have one but I'd like to have one that is competent (inaudible)." Transcript at 18. The court asked what issues Burton had with Attorney Wilson and Burton noted that he "only come up to see [him] one time at the jail" and "[h]e was there and in a few minutes [Burton] asked . . . why [his] motions (inaudible) and if he would resubmit them and he said they were . . . frivolous. To me my motions aren't frivolous." *Id.* The court responded that it did not "hear anything that indicates to me that there was [sic] any competency issues" and that Burton could either be represented by Attorney Wilson or proceed *pro se*, and Burton responded: "I guess I'll have to represent myself." *Id.* The court again warned Burton against the risk of self-representation, and Burton affirmed his decision to proceed *pro se*.

[13] The court proceeded to address Burton's *pro se* motions. Regarding the motion asking to produce any agreement with CI-32 and CI-32's criminal history, Prosecutor Bradley Cooper stated that there had been a written agreement but that agreement had expired before the investigation into Burton. The prosecutor agreed to provide CI-32's criminal history and a copy of the agreement. Burton argued regarding his motion for a special prosecutor that his request was based "on a 2009 case that was in this same courtroom amongst

you, with this same prosecutor, Brad Cooper who had falsified evidence and (inaudible) the documents." *Id.* at 28. The court noted that Burton's motion contained information of a complaint he filed against Prosecutor Cooper "with the State Disciplinary Authorities" at that time, and, when prompted, Prosecutor Cooper confirmed this and told the court that the disciplinary commission did not pursue disciplinary charges against him. *Id.* at 29. The court denied Burton's request for a special prosecutor. The prosecutor then made a motion in limine to prevent Burton from making reference to his previous prosecution, which the court granted.

[14] The court asked Attorney Wilson about providing Burton with the State's discovery materials, and Wilson stated that he had the materials, including materials he received from Attorney Miles, and that he would turn them over to the jailer for Burton. The prosecutor then stated that "we have provided a lot of supplemental discovery last week after Mr. Wilson's appointment" and sent the materials to him, asked if Attorney Wilson had received such materials, and Attorney Wilson replied that he had not and that the materials should be sent to Burton. *Id.* at 36. The prosecutor then stated that "the last thing that I had that I don't think Mr. Burton had yet was we just got lab results back on his stuff," and he handed Burton a copy of the results in open court. *Id.* at 37. The jailer stated to the court that Burton would "not be able to have DVD's [sic] or CD's [sic] or anything in the jail," and the court replied that Burton needed a way to view them to prepare his defense and that if the jail commander "can't figure it out on his own have him call me and we will formulate a resolution direct." *Id.*

at 38. The court and Burton further discussed the State's discovery, and the court asked Burton if he wanted a continuance, and Burton responded: "Yes, sir. No! No, I don't want one . . . ." *Id.* at 40. The following exchange then occurred:

> THE COURT: I'll be happy to give you a continuance so you can review discovery, get prepared, do whatever. But you know what again you can't have your cake and eat it too. You want a speedy trial I'm going to give it to you.
>
> BURTON: That's all I want.
>
> THE COURT: If that means everything time wise is compressed into a miniscule period of time under which . . . . for everybody to get prepared then everybody is responsible for the consequences of their actions, and that includes you. So if you want more time I can get you more time but I can't get you a trial starting tomorrow morning and more time.
>
> BURTON: I'm ready to go to trial.
>
> THE COURT: I simply don't have a mechanism to expand the world time line . . .
>
> BURTON: I'm ready for trial. I understand, Your Honor, and I'm . . . .
>
> THE COURT: . . . to create an environment under which you get to do everything that you want before trial and you get trial starting tomorrow morning.
>
> BURTON: With all due respect . . .
>
> THE COURT: So, whatever you want you're going to get time wise. So do you want a trial starting tomorrow?
>
> BURTON: Sure.

*Id.* at 40-41. At the conclusion of the hearing, the court asked Burton if he wanted Attorney Wilson to remain as standby counsel, and Burton declined.

[15] The court reconvened the following day, August 27, 2013, and the court started by again asking Burton if he wanted to proceed *pro se*, noting that "once I bring in the jury and we start the trial is really kind of your final opportunity," and Burton replied: "Yes, sir." *Id.* at 48. Burton raised the issue of CI-32's criminal history, noting that the history he received "only goes back to June" and he knew that CI-32, whom he referred to by name, "is being housed in the Johnson County Jail as of today on new charges." *Id.* Prosecutor Cooper responded that there were two cases and he had not been convicted of those charges, the court ordered that "a copy of the CCS" be turned over to Burton, the prosecutor then said "[a]nd there's four more coming" which were "filed under seal" and which had not yet been unsealed, and the court stated that it would "cross that bridge" if in fact CI-32 was called to testify. *Id.* at 57-58.

[16] Following *voir dire*, Burton asked whether his sister Angela could sit at the table so that he could confer with her about the proceedings, and Prosecutor Cooper responded "[w]e don't care." *Id.* at 71. The State began its opening statement and referenced the video recording of the March 22, 2013 methamphetamine buy, and Burton objected and stated that he had not received copies of any videos. The court excused the jury, and Prosecutor Cooper indicated that he gave copies of the videos to Attorney Miles and "also gave Mr. Wilson complete access to my file including the videos." *Id.* at 94. The court, after

hearing this discussion, noted that it was not sure whether Burton had previously received copies of the videos and ordered that a copy be made for him. Burton also orally requested a change of venue and that a special prosecutor be appointed, and the court denied his motion. Soon after, the court recessed for the day to give Burton an opportunity to review the videos and noted that "[i]f in fact you want a continuance thereafter, I'll need to specifically know what is in that tape that you did not anticipate, and what type of evidence you need time to collect in response to or in rebuttal to take." *Id.* at 106.

[17] The next day, Burton stated to the court that he "would like to take you upon [sic] that offer that you offered me yesterday . . . . I would like to ask for a continuance and ask for counsel." *Id.* at 126. The court replied that it "indicated . . . before we started the trial that that was pretty much your last opportunity" and asked what had changed, and Burton responded that he was "not ready for this," that he needed "to do some research," and that he was "due to be a father within the next month and a half, two months. I'd really like to get out there to see my child." *Id.* at 126-127. The State objected to Burton's motion and noted that a jury was empaneled and that "[w]e have our evidence here, our people here, all based on the speedy trial request . . . ." *Id.* at 127. The court stated to Burton that "the probable cause affidavit described in some detail the transactions that are alleged" and that the DVD "simply is a picture of those same events," and it asked Burton what changed that required "additional time to get prepared?" *Id.* at 128. Burton responded that

"according to the Indiana Wiretap law . . . [he] should have been allowed at least fourteen days prior to the procedures of this . . . to prepare [] for trial," and that "once again . . . I do have a child being born here in about a month and a half and I would like . . . to see him be born . . . ." *Id.* at 128-129. The court found that there was not a reasonable basis for a continuance and denied Burton's request, but it did appoint Attorney Heath Johnson to act as standby counsel for Burton.[2]

[18] At the trial, the State presented the testimony of Detectives Wampler and Katt, and it played for the jury video recordings of each of the four buys which were either recorded using Detective Katt's covert recording device or a camcorder used by Detective Wampler. The State also offered, and the court admitted, the actual methamphetamine, Xanax, and hydrocodone that Burton sold to either CI-32 or Detective Katt during the four buys. During Burton's cross-examination of Detective Wampler, Detective Wampler testified that after CI-32 completed the three initial buys on his contract to have certain charges dropped, CI-32 was paid $100 per buy for additional buys. The State offered and the court admitted a copy of the Johnson County Sheriff's Office Cooperating Individual Agreement with CI-32 in which CI-32 agreed "to cooperate fully with the Johnson County Sheriff's Office of my own free will

---

[2] When Attorney Johnson is being introduced to Burton and addresses the court about not having a conflict of interest, the transcript lists the attorney's name as "KYLE JOHNSON." Transcript at 134. When the attorney is introduced to the jury, however, the court introduces him as "Mr. Heath Johnson," and Attorney Johnson then states: "I'm Heath Johnson. I'll be standby counsel for Mr. Burton here today." *Id.* at 138.

and accord and not as a result of intimidations or threats." *Id.* at 366. Detective Wampler testified that although the contract was "for the three that he was working off," he believed regarding the issue of CI-32's consent to be recorded that "we're still . . . (inaudible) our original agreement" and that "[n]othing in the contract states when it expires." *Id.* at 369. He also testified that "[e]verything that Mr. CI-32 did was on his own free will." *Id.*

[19] On August 29, 2013, the jury found Burton guilty as charged on Counts I-IV. He was sentenced to an aggregate term of thirteen years, including ten years executed in the Department of Correction and three years suspended.

### Issues and Analysis

### I.

[20] The first issue is whether the trial court violated Burton's right to counsel. A defendant's right to counsel arises at any point during a criminal proceeding in which the absence of counsel would erode the defendant's right to a fair trial. *Hopper v. State*, 957 N.E.2d 613, 616 (Ind. 2011) (citing *Hernandez v. State*, 761 N.E.2d 845 (Ind. 2002), *reh'g denied*). "This includes any critical stage in which '(1) incrimination may occur or (2) where the opportunity for effective defense must be seized or be foregone.'" *Id.* (quoting *Hernandez*, 761 N.E.2d at 850). An initial hearing conducted under Indiana's statutory scheme is not a critical stage of the criminal proceeding requiring the presence of counsel. *Id.* at 616-617 (citing *Benner v. State*, 580 N.E.2d 210 (Ind. 1991)).

[21]     A failure to permit any defendant to have counsel constitutes a deprivation of that defendant's constitutional right to due process of law. *Graves v. State*, 503 N.E.2d 1258, 1260 (Ind. Ct. App. 1987) (citing *Spinks v. State*, 437 N.E.2d 963 (Ind. 1982)). The purpose of the guarantee of the right to counsel is to protect a defendant from being convicted because of his own ignorance of his legal and constitutional rights and to assure him of the guidance of counsel throughout the proceeding. *Id.* (citing *Koehler v. State*, 499 N.E.2d 196 (Ind. 1986)). Correlative to the right to representation by counsel is the right of a defendant to waive counsel and represent himself. *Id.* (citing *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525 (1985)).

[22]     Also, to the extent Burton suggests a violation of his right to due process, this court has previously observed that "[t]he concept of due process is difficult to precisely define, and [i]ndeed its pervasive character has led the court to decline an attempt at fixing its perimeters." *Collins v. State*, 163 Ind. App. 72, 80, 321 N.E.2d 868, 873 (1975) (citing *Bute v. Illinois*, 333 U.S. 640, 68 S. Ct. 763 (1948); *Parks v. State*, 159 Ind. 211, 64 N.E. 862 (1902)). Most often it is instead referred to as the very essence of a scheme of ordered justice; the basic value of a sense of justice and fair play. *Id.* (citing *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428 (1967); *Clemons v. State*, 162 Ind. App. 50, 317 N.E.2d 859 (1974), *cert. denied*, 423 U.S. 859, 96 S. Ct. 113 (1975)).

[23]     Burton argues that "[t]he initial hearing took place on June 26, 2013, at which time [he] requested a public defender, and the court appointed Attorney Carrie Miles," that "Attorney Miles never entered her Appearance, never met with

[Burton], and never appeared at a single hearing," and that "[b]y the time an attorney finally appeared on behalf of [him], it was August 15, 2013, more than six weeks after his initial hearing and more than two months after his arrest on June 9, 2013." Appellant's Brief at 13-14. He states that at the pretrial hearing on August 15, 2013, Attorney Wilson stated that he would "be out to see him probably Monday," which "would have been August 19, 2013, a week before the jury trial began. This is simply not fair." *Id.* at 14.

[24] The State argues that Burton "distorts the facts by stating that he was not represented until less than two weeks before his trial," noting that he did not request counsel at his initial hearing, and he did not request a public defender until August 1, 2013 to "assist with defense." Appellee's Brief at 21 (quoting Appellant's Appendix at 238). The State further notes that Burton repeatedly reiterated his desire to have a speedy trial despite the court's numerous offers of a continuance. The State argues that Attorney Miles was appointed after Burton did request to have a public defender appointed, and following her filing a motion to withdraw due to a conflict, his case was transferred to the Johnson Circuit Court due to a conflict with the public defenders in Superior Court No. 2, and the Circuit Court appointed Attorney Wilson. The State further notes that Attorney Wilson filed a motion to withdraw from the case on August 20, 2013, at Burton's request, and the court at the pretrial hearing on August 26, 2013, told Burton that he could either be represented by Attorney Wilson or proceed *pro se* because the court did not believe Attorney Wilson to be incompetent.

[25]  We begin by analyzing an apparent ambiguity in the record regarding whether Burton requested that a public defender be appointed at his initial hearing on June 26, 2013. The record contains three versions of the Initial Hearing and Discovery Order, each of which are file-stamped June 26, 2013. The first version states in part that the "Court now appoints Carrie Miles as public defender herein." Appellant's Appendix at 59. It also ordered Burton to "pay $100.00 for Felony charge/$50.00 for Misdemeanor charge into the Supplemental Public Defender Fund." *Id.* That version does not recognize Burton's speedy trial request and set the pretrial date for September 26, 2013, and trial date for January 21, 2014. A second version does not mention appointing a public defender, nor does it acknowledge Burton's speedy trial request, and again notes that the pretrial date was set for September 26, 2013, and the trial date was set for January 21, 2014. The third version sets the pretrial hearing for August 1, 2013 and the speedy trial date for August 27, 2013. It does not appoint a public defender. Also, the CCS entry dated June 26, 2013, regarding Burton's initial hearing, states:

> Video Conferencing Initial Hearing is held, and preliminary plea of not guilty enters. *Defendant does not request public defender.* Defendant requests Speedy Trial by Jury. Cause is set for pre-trial on August 1, 2013 at 9:00 a.m. and for Speedy Trial by jury on August 27, 2013 at 8:30 a.m. Court Order on Discovery is filed and granted per signed order.

*Id.* at 3 (emphasis added). Thus, the CCS entry follows the third version of the Initial Hearing and Discovery Order.[3]

[26] As noted above, in July Burton acted as his own attorney and filed a number of *pro se* motions. At the pretrial hearing held on August 1, 2013, Burton stated to the court that at the initial hearing he "asked for a special prosecutor and . . . also requested for a, a public defender, but I noted that I was (INAUDIBLE) in the record (INAUDIBLE)," and the court interrupted and replied: "But quite to the contrary . . . the record that was created at the day you were here says specifically 'defendant does not request public defender'." *Id.* at 237. The court asked Burton if he was asking for a public defender at that juncture, and Burton responded: "To maybe kind of help me through this. I mean, I'm, you know, I don't know all the rules and regulations on this, you know, I just need a little guidance. (INAUDIBLE) yes sir." *Id.* at 238. The court then swore Burton in, asked him questions about his financial situation, and appointed Attorney Miles.

[27] We note that "[i]t is well settled that the trial court speaks through its CCS or docket . . . ." *Beeler v. State*, 959 N.E.2d 828, 830 (Ind. Ct. App. 2011), *trans. denied*. We therefore find the CCS entry for June 26, 2013 stating that Burton did not request a public defender persuasive. This conclusion is bolstered by

---

[3] We note that the file-stamps contained in the first and second versions of the Initial Hearing and Discovery Order are in color, and indeed these documents appear to be originals. The file stamp contained in the third version, however, is not in color, and that document appears to be a photocopy, presumably from the clerk's record.

the fact that only the third version of the Initial Hearing and Discovery Order set the pretrial date of August 1, 2013, and the speedy trial date of August 27, 2013, and the first version, which was the only version mentioning that the court was appointing Attorney Miles, set pretrial and trial dates later than the speedy trial dates.

[28] Based upon our review of the record, we find that Burton did not request a public defender until the August 1, 2013 pretrial hearing and that accordingly his suggestion to the contrary is erroneous. On August 6, 2013, Attorney Miles filed her motion to withdraw due to a conflict, and Burton's case was transferred to the Johnson Circuit Court based on that conflict. On August 15, 2013, the Johnson Circuit Court held a pretrial hearing and at the outset asked Burton if he wanted an attorney appointed to represent him, and Burton responded that he "would like to have an attorney to assist me." Transcript at 3-4. The court inquired what he meant by "assist," asking if he wanted an attorney "just to stand by and give you documents if you request it," Burton replied "[s]ure," and the court stated that it did not "allow what we call hybrid or bifurcated representation." *Id.* at 4. The court advised Burton against proceeding *pro se* but noted that it would appoint an attorney as standby counsel if Burton so chose. Burton stated that he would "go ahead and take a public defender at this moment. But I would like it to be duly noted that I don't want no continuances on my behalf." *Id.* at 5. The court appointed Attorney Wilson to represent him. Five days later, on August 20, 2013, Attorney Wilson filed a motion to withdraw at Burton's request.

[29] To the extent Burton suggests that the appointment of Attorney Wilson on August 15, 2013 was inadequate to satisfy his right to counsel due to the impending speedy trial date of August 27, 2013, we note that courts have "repeatedly held that a violation of a defendant's right to counsel occurs where counsel is appointed so shortly before the commencement of trial that there cannot have been time for effective preparation." *Collins*, 163 Ind. App. at 75, 321 N.E.2d at 870-871 (citing *Powell v. Alabama*, 287 U.S. 45, 53 S. Ct. 55 (1932); *Sweet v. State*, 233 Ind. 160, 117 N.E.2d 745 (1954); *Bradley v. State*, 277 Ind. 131, 84 N.E.2d 580 (1949); *Hoy v. State*, 225 Ind. 428, 75 N.E.2d 915 (1947); *Hartman v. State*, 155 Ind. App. 199, 292 N.E.2d 293 (1973)). The Indiana Supreme Court, in *Lloyd v. State*, stated that "[w]e do not here pretend to fix a minimum period of time which must be allowed by the court in every case between the time of the appointment or employment of counsel and the commencement of trial," but noted that in that case in which the defendant was charged with murder, "a period of two and one-half hours (including the lunch period) was utterly insufficient for consultation, investigation and preparation for trial, resulting in a virtual denial of the appellant's constitutional right to assistance of counsel." 241 Ind. 192, 198-199, 170 N.E.2d 904, 907-908 (1960).

[30] Here, by contrast, had Attorney Wilson not been fired by Burton, he would have had almost two full weeks to prepare for Burton's speedy trial. We cannot say that such amount of time, taking into account the fact that Burton insisted on a speedy trial, there were few witnesses, that the most probative evidence consisted of four video recordings, is insufficient to violate Burton's right to

counsel or due process rights. However, even assuming that this timeframe could potentially be problematic, we find that Burton waived his right to counsel when, at the pretrial hearing on August 26, 2013, he fired Attorney Wilson and decided to proceed *pro se*. In *United States v. Irorere*, 228 F.3d 816 (7th Cir. 2000), the Seventh Circuit observed that "a defendant may waive his right to counsel through his own contumacious conduct." *Irorere*, 228 F.3d at 826. During the course of that case, "[t]he district court appointed four separate lawyers for the defendant, including one of the four twice," and that each "of these lawyers either requested to withdraw because of the defendant's lack of cooperation or were discharged by the defendant, and the district court clearly advised the defendant of the difficulties and dangers of proceeding without the assistance of counsel." *Id.* at 828. The district court also "warned the defendant that it would not appoint another lawyer after [the last one] and gave the defendant the option to avail himself of counsel or to proceed *pro se*." *Id.* The court held that the district court did not abuse its discretion when it refused to appoint new counsel for the defendant. *Id.*; *see also Kroegher v. State*, 774 N.E.2d 1029, 1036 (Ind. Ct. App. 2002) (noting that "courts have determined that a defendant may waive his right to counsel by his conduct in firing his attorneys or failing to retain counsel if he has the financial ability to do so" (citing *Irorere*, 228 F.3d at 828)), *trans. denied*.

[31] Under the circumstances, we cannot say that the court violated Burton's right to counsel.

[32] The next issue is whether the court abused its discretion in denying Burton's motion for a continuance. Burton does not argue that his motion was based on a reason identified in Ind. Code § 35-36-7-1, which governs continuances. Rulings on nonstatutory motions for continuance lie within the discretion of the trial court and will be reversed only for an abuse of that discretion and resultant prejudice. *Maxey v. State*, 730 N.E.2d 158, 160 (Ind. 2000). An abuse of discretion occurs only when the decision is clearly against the logic and effect of the facts and circumstances. *Palmer v. State*, 704 N.E.2d 124, 127 (Ind. 1999). We will not conclude that the trial court abused its discretion unless the defendant can demonstrate prejudice as a result of the denial of the motion for continuance. *Dorton v. State*, 419 N.E.2d 1289, 1295 (Ind. 1981). Continuances to allow more time for preparation are not favored and are granted only by showing good cause and in the furtherance of justice. *Timm v. State*, 644 N.E.2d 1235, 1237 (Ind. 1994).

[33] Burton begins his argument on this issue by asserting, erroneously, that "[t]he discovery deadline in this case was July 26, 2013." Appellant's Brief at 16. He cites to the first version of the court's initial hearing and discovery order for this proposition, which set the omnibus date for September 26, 2013. He goes on to discuss the timeline of when he received the State's discovery, in which he received some of it on the eve of trial, August 26, 2013, and acknowledges that "the trial court offered a continuance at the August 26, 2013 pre-trial, but at that time [he] stated he did not want a continuance." *Id.* at 17. He argues that

the court abused its discretion by not granting a continuance when he requested one during the State's opening statement, stating specifically that "[a]ppointing standby counsel in the middle of the jury trial was too little too late," that "[t]his is trial by surprise, and [he] was forced to fend for himself under the extreme and dire circumstance of having received his discovery evidence the night before trial and not begin allowed to view the DVD's [sic] until after the trial commenced." *Id.* at 22-23. The State asserts that "[t]he court did not believe that [Burton] needed any additional time to prepare because the DVD merely represented the events that were described in detail in the probable cause affidavits" and that Burton's "true motivation for requesting a continuance seemed to be that he wanted to have the opportunity to see his child." Appellee's Brief at 25-26.

[34] At the trial, following his objection during the State's opening statement, the jury was excused from the courtroom and the following discussion took place:

> THE COURT: Okay. The video you were referring to is on which date?
>
> [Prosecutor Villanueva]: There will be multiple videos we are referring to judge. The one that I just mentioned in opening was a video that was shot for March 22nd.
>
> THOMAS BURTON: I object to that because I have yet . . .
>
> THE COURT: Has that been provided to the defendant?
>
> [Prosecutor Cooper]: Yes.
>
> THOMAS BURTON: Where? I never . . . I haven't got it.

THE COURT: Is that part of the CD's [sic] that were given to him yesterday?

[Prosecutor Cooper]: Yes . . . oh, yesterday. No. (Inaudible) they were originally given to Ms. Miles in the original discovery packet that was forwarded . . .

THOMAS BURTON: Laughing . . .

[Prosecutor Cooper]: If I may, sir. That was forwarded over to Mr. Wilson at some point-in-time by Ms. Miles. I was not part of that. I also gave Mr. Wilson complete access to my file including the videos. He had all those things. Ms. Miles had all those things. Not my obligation to give them to the defendant when they were counsel of record. They have been provided to the defendant through counsel when they were counsel of record.

THOMAS BURTON: I was never . . . she (inaudible) up here.

THE COURT: Okay. All right. So those have been provided to Ms. Miles and also . . .

[Prosecutor Cooper]: Mr. Wilson, yes.

THE COURT: Mr. Wilson. All right. And when Mr. Wilson gave you a packet of materials was there no CD's [sic] in it?

THOMAS BURTON: He never gave me a packet of materials.

THE COURT: He gave it to you in open court yesterday. He gave it to the deputy and . . .

THOMAS BURTON: He did. Oh, that was a audio jail record. That's it. That's all I got. Jail record . . . jail phone conversations.

* * * * *

THE COURT: . . . . I offered you an opportunity that if you felt you needed additional time to get prepared, once you did get the discovery, that you could have a continuance and you refused that. So, you've had an opportunity, I'll give you another opportunity. Cause what I'm going to do today is I'm going to have them give you a copy of it. If after you review it you believe that you need additional time in which

> to get prepared and you need a continuance you can let me know. Got it?
>
> THOMAS BURTON: Yes, sir.

Transcript at 93-96. The court went on to state: "Yep. Just go ahead and make a copy. I don't know whether it was given to the defendant or not. That's really between Ms. Miles and Mr. Wilson. But since they aren't here right now for me to inquire about we'll just give him an additional copy." *Id.* at 96.

[35] The court then allowed the State to continue with its opening statement, Burton objected again, and the court ultimately recessed for the day to give him an opportunity to review the videos and noted that "[i]f in fact you want a continuance thereafter, I'll need to specifically know what is in that tape that you did not anticipate, and what type of evidence you need time to collect in response to or in rebuttal to take." *Id.* at 106. The next day, Burton stated to the court that he "would like to take you upon [sic] that offer that you offered me yesterday . . . . I would like to ask for a continuance and ask for counsel." *Id.* at 126.

[36] Here, we agree with the court's determination that Burton did not demonstrate that he was prejudiced by its decision not to grant a continuance during the State's opening statement. Recognizing that Burton had not possessed certain discovery until the eve of trial, the court offered him multiple chances to continue his trial and waive his right to a speedy trial, and each time he responded that he did not want a continuance and that he was ready to

proceed. The court warned Burton of the consequences once trial commenced and asked if he wanted to continue that trial. The State provided copies of the drug buys to Attorney Miles and Attorney Wilson. After Burton objected regarding the video recordings of the drug buys, the court recessed to allow him to view the recordings and to seek a continuance if he could articulate prejudice. Although the record is not clear on this score, even if Burton did not receive copies of the video recordings, he did not articulate how or why he was prejudiced. He possessed a copy of the probable cause affidavit and charging information and thus knew of the allegations against him and the testimony the detectives would be providing. We therefore conclude that the court did not abuse its discretion when it denied his request for a continuance.[4]

## III.

[37] The next issue is whether the court abused its discretion and violated Burton's confrontation rights by not ordering the State to produce CI-32's recent criminal history and not ordering the State to reveal any deals it made with CI-32. The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, provides: "In all criminal prosecutions,

---

[4] Burton also suggests in his brief that the court abused its discretion in not granting a continuance because "[t]he State never revealed the deal it made with the confidential information [sic] and instead objected to [Burton's] discovery request for information about leniency shown to the confidential informant." Appellant's Brief at 22. As noted, however, Burton's request for a continuance which was denied was based upon whether the State provided him with the video recordings of the drug buys. Moreover, we note that the contract governing CI-32's position as a confidential informant was provided to Burton, and at trial Detective Wampler testified regarding CI-32's participation in further investigations and that he was paid $100 per additional buy.

the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "The Confrontation Clause applies to an out-of-court statement if it is testimonial in nature, the declarant is not unavailable, and the defendant has had no opportunity to cross-examine the declarant" to bar admission of such statements. *Speers v. State*, 999 N.E.2d 850, 852 (Ind. 2013) (citing *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L.Ed.2d 177 (2004)), *cert. denied*, 134 S. Ct. 2299 (2014); *see also Davis v. Washington*, 547 U.S. 813, 821-822, 126 S. Ct. 2266 (2006). "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Crawford*, 541 U.S. at 68-69, 124 S. Ct. at 1374.

[38] Burton argues that he filed *pro se* motions seeking CI-32's criminal history, the promises made to CI-32, and the experience prosecutors and officers have had with CI-32 as a confidential informant, and the State objected on two bases: (1) that such requests "appeared to be in the form of interrogatories" to the prosecutor; and (2) that the State did not intend on calling CI-32 as a witness. Appellant's Brief at 27. Burton asserts that "[t]he State failed to provide deals it made with [CI-32], failed to provide his complete criminal history, and failed to call him as a witness in an attempt to circumvent the issue." *Id.* at 29.

[39] Generally, challenges based upon the Confrontation Clause pertain to the admission of evidence, namely, testimonial evidence. *See, e.g.*, *Jones v. State*, 982 N.E.2d 417, 421, 428 (Ind. Ct. App. 2013) (holding that a certificate of inspection certifying that certain breath test equipment is in "good operating

condition" is nontestimonial and that the court did not err in admitting the certification), *trans. denied*. Here, Burton does not identify any particular "testimonial" statement which was allegedly improperly admitted. We find that he has waived the issue because he does not present cogent argument. *See, e.g.*, *Cooper v. State*, 854 N.E.2d 831, 834 n.1 (Ind. 2006) (holding that the defendant's contention was waived because it was "supported neither by cogent argument nor citation to authority"); *Shane v. State*, 716 N.E.2d 391, 398 n.3 (Ind. 1999) (holding that the defendant waived argument on appeal by failing to develop a cogent argument).

[40] Nevertheless, to the extent that Burton attempts to suggest that his Sixth Amendment right to confrontation was violated because the State concealed CI-32's identity from him, thereby preventing him from calling CI-32 as a witness, we find that the record belies this assertion. He was provided with the contract between the Johnson County Sheriff's Office and CI-32 which contains CI-32's true identity and CI-32's signature. Indeed, in one of Burton's handwritten *pro se* motions, "Defendant's Motion for Consensual Interception and Transmission of Recorded [sic] of any Communication of State's Witness," which was filed on August 1, 2013, Burton refers to CI-32, accurately, by name. Appellant's Appendix at 79. He also knew that, at the time of trial, CI-32 was being housed in the Johnson County Jail. Burton does not cite to the record for the proposition or otherwise demonstrate that he was prevented from calling CI-32 as a witness. We cannot say that his confrontation rights were violated on this basis. *See Fowler v. State*, 829 N.E.2d 459, 465 (Ind. 2005) (noting that

"a witness is not unavailable simply because the witness does not take the stand" and that "tools to compel attendance must be exhausted before a claim of violation of the Confrontation Clause will be entertained"), *reh'g denied*, *cert. denied*, 547 U.S. 1193, 126 S. Ct. 2862 (2006).

IV.

[41] The next issue is whether the court abused its discretion when it denied Burton's *pro se* Motion for Special Prosecutor to be Appointed ("Motion for Special Prosecutor").[5] We review a trial court's denial of a petition for special

---

[5] Burton also alleges error by the court in "denying the motion for change of venue." Appellant's Brief at 34. In his brief, he appears to argue both that he requested a change of judge due to bias stemming from the same judge handling the case from which his motion for the appointment of a special prosecutor is based, as well as a motion for change of venue due to pretrial publicity. He argues that "[t]he trial court engaged in a lengthy dialogue with [him] regarding the change of venue, which [Burton] again renewed during the first day of the jury trial," and cites to a portion of the transcript from August 27, 2013. *Id.* Ind. Crim. Rule 12(A) governs motions for change of venue in criminal cases and states:

> In criminal actions . . . a motion for change of venue from the county shall be verified or accompanied by an affidavit signed by the criminal defendant or the prosecuting attorney setting forth facts in support of the constitutional or statutory basis or bases for the change. Any opposing party shall have the right to file counter-affidavits within ten (10) days, and after a hearing on the motion, the ruling of the court may be reviewed only for abuse of discretion.

Also, Ind. Crim. Rule 12(B) governs motions for a change of judge in felony and misdemeanor cases and states:

> In felony and misdemeanor cases, the state or defendant may request a change of judge for bias or prejudice. The party shall timely file an affidavit that the judge has a personal bias or prejudice against the state or defendant. The affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be accompanied by a certificate from the attorney of record that the attorney in good faith believes that the historical facts recited in the affidavit are true. The request shall be granted if the historical facts recited in the affidavit support a rational inference of bias or prejudice.

prosecutor for an abuse of discretion. *Camm v. State*, 957 N.E.2d 205, 209 (Ind. Ct. App. 2011) (citing *State ex. rel. Steers v. Holovachka*, 236 Ind. 565, 575, 142 N.E.2d 593, 597 (1957)), *trans. denied*. "An abuse of discretion is an erroneous conclusion and judgment, one clearly against the logic and facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.* An abuse of discretion also occurs when the trial court misinterprets the law. *Id.*

[42]     At the time of Burton's trial, the appointment of special prosecutors was governed by Ind. Code § 33-39-1-6, which provided in relevant part:

>     A circuit or superior court judge:
>
>                               * * * * *
>
>         (2) may appoint a special prosecutor if:
>
>                 (A) a person files a verified petition requesting the appointment of a special prosecutor; and
>
>                 (B) the court, after:
>
>                         (i) notice is given to the prosecuting attorney; and
>
>                         (ii) an evidentiary hearing is conducted at which the prosecuting attorney is given an opportunity to be heard;

---

Here, Burton did not file affidavits setting forth facts supporting a change of venue or change of judge, nor did he file written motions at all. Rather, while discussing his pro se motions he orally requested a change of venue and alleged bias on the part of the judge. We find that Burton has not properly preserved this issue for appeal.

finds by clear and convincing evidence that the appointment is necessary to avoid an actual conflict of interest or there is probable cause to believe that the prosecutor has committed a crime;

Ind. Code § 33-39-1-6(b) (West 2012).[6]  The petitioner has the burden of producing evidence of an actual conflict.  *Camm*, 957 N.E.2d at 210 (citing *Kubsch v. State*, 866 N.E.2d 726, 734 (Ind. 2007)).

[43]     The purpose of the special prosecutor statute is to protect the State's interest in preserving the public confidence in the criminal justice system and ensuring that the prosecutor serves the ends of justice.  *Id.* (citing *State ex rel. Kirtz v. Delaware Circuit Court No. 5*, 916 N.E.2d 658, 659 (Ind. 2009)).  "In criminal proceedings, the prosecutor represents the interests of the State; and, 'like any other client, the State is entitled to undivided loyalty.'"  *Id.* (quoting *In re Matter of Ronald L. Davis*, 471 N.E.2d 280, 281 (Ind. 1984)).  "For the purposes of the special prosecutor statute, an actual conflict of interest arises where a prosecutor places himself in a situation inherently conducive to dividing his loyalties between his duties to the State and his personal interests."  *Id.*  "As a general rule, appointment of a special prosecutor may be required if the elected prosecutor has a special interest in the outcome of the case."  *Id.*

---

[6] Ind. Code § 33-39-1-6 was repealed by Pub. L. No. 57-2014, § 4 (eff. July 1, 2014).  This statute was replaced by Ind. Code § 33-39-10-2 (West 2014).

On August 1, 2013, Burton filed his motion requesting that the court appoint a special prosecutor from outside Johnson County due to a previous prosecution against him in 2009 which was dismissed on January 19, 2011. The motion notes that Burton filed a complaint against Prosecutor Cooper with the Disciplinary Commission and attached his complaint, as well as a letter from the Commission to Prosecutor Cooper informing him of the complaint. At the pretrial hearing held on August 26, 2013, the court heard arguments on Burton's numerous *pro se* motions including the Motion for Special Prosecutor in which he argued that Prosecutor Cooper "falsified evidence and (inaudible) the documents" against him in the 2009 case. Transcript at 28. He noted that ultimately that case was the subject of a news story by "Brad Edwards of Channel 8 News," which principally investigated Johnson County Detective Brian Burton but which also mentioned Prosecutor Cooper.[7] *Id.* at 29. The court asked Burton if he knew how the Commission's investigation was resolved, and he stated that he had "no idea. They did not tell me." *Id.* at 30. The court asked Prosecutor Cooper whether the matter had been resolved, and he replied that the Commission did not take disciplinary action against him. The court asked him if he believed a special prosecutor was appropriate, and Prosecutor Cooper stated "I do not," noting that he did not agree with Burton's representations. *Id.* at 31. The court denied the motion. On appeal, Burton

---

[7] In his motion, as well as his brief, Burton cites to the Channel 8 WISH-TV news report. *See* Channel 8 WISH-TV, *50 drug cases dropped as cop charged*, *available at* https://www.youtube.com/watch?v=zT0eSeIK71o (last visited January 6, 2015).

makes a new argument as to why the court abused its discretion. Specifically, his entire argument on this issue is:

> In this case, the State objected to the defense seeking any deals made with [CI-32] because the *pro se* motions "appeared to be in the form of interrogatories to myself." Tr. at 21. This makes clear the prosecutor knew ahead of time (this was at the final pre-trial on August 26, 2013) he was potentially a witness in the case. The trial court found "if there was certainly any oral agreements that can be gleaned from your cross examination and or deposition." *Id.* The problem with the trial court's reasoning is the deals at issue would have been made directly between the prosecutor's office and the confidential informant so the court's decision prevented [Burton] from discovering the needed evidence and from formulating a defense for himself. *See* Tr. at 253 (where Det. Wampler testified: "I am not familiar if CI-32 has a written agreement with the prosecutor's office.").

> It is the prosecutor's office (not the detectives employed by the Johnson County Sheriff) who had the authority to make deals with the confidential informant. By avoiding the discovery request based upon an improper "form" (the State construed the discovery requests as "interrogatories"), the State elevated form over substance and dodged its responsibility. Given those particular circumstances (which are further exacerbated given the history between Tommy and the Johnson County officials chronicled by the Channel 8 expose of the numerous botched drug investigations and subsequent federal lawsuit), it is clear the trial court abused its discretion in denying the request for a special prosecutor.

Appellant's Brief at 33-34.

[45] We note that, at the August 26, 2013 hearing, the court specifically ordered Prosecutor Cooper to provide Burton with a copy of any agreement between the Prosecutor's Office and CI-32. Indeed, as discussed in Part III above, such

agreement was entered into evidence at trial, and Detective Wampler testified regarding how CI-32 was paid for drug buys.  Second, and more importantly, Burton's argument fails to articulate the existence of an actual conflict between Prosecutor Cooper and Burton, and he does not cite to evidence demonstrating the existence of an actual conflict by clear and convincing evidence.  Burton does not show how Prosecutor Cooper purportedly keeping secret from him an agreement with CI-32 created a situation in which Prosecutor Cooper's loyalties between his duties to the State and his personal interests were divided.  We conclude that the court did not abuse its discretion in denying Burton's Motion for Special Prosecutor.

V.

[46]     The next issue is whether the prosecutor committed prosecutorial misconduct resulting in fundamental error.  In raising this issue, Burton's brief contains the following, which cites to a portion of the *voir dire* transcript:

> STATE:  I understand.  We, basically it is an impossible task.  There is no way I can get to know you folks well enough in the next forty five minutes to know enough about you to get this done.  In fact a attorney friend of mine who is certainly more talented and experienced at this than I refers to this as legal speed dating.  So, I'm going to kind of get at you very quickly and I'm going to give you some speed dates.  We are going to find out what we are going to do.  Dance together[8]or something like that.

---

[8] In the transcript, the words "Dance together" do not appear and it states "(Inaudible)."  Appellant's Appendix at 263.  Burton includes in his appellant's appendix a Second Verified Motion to Correct the Record Pursuant to Indiana Appellate Rule 32 in the Johnson County Circuit Court in which he lists, among other things, various instances in the transcript which he asks to be corrected and states specifically that "[o]n

****

App. 263, 368.  The State followed this general introduction with questions to individual panel members.  The following dialogue took place:

STATE:  With all this speed we are going on a date by the way.

JUROR:  Okay.

App. 279.  That same juror had just finished explaining: "I'm twenty four and I have lost seventeen friends to drugs."  App. 278.  The State followed up on this revelation with: "Seventeen, you know seventeen friends of your[s] who died of an overdose?"  *Id.*  The juror agreed that she did.  *Id.*

Appellant's Brief at 38.

[47]  Burton argues that the prosecutor went "too far" during *voir dire* when he

characterized the process

as speed dating . . . especially when: (1) he told the juror (who had just commented she had an inordinately large number of friends die from drug overdoses) "we are going on a date"; (2) that same juror said: "Okay"; (3) this is a drug case; and (4) the State began the entire process by saying "we are going to find out what we are going to do. Dance together or something like that."

*Id.* at 38-39.

page eighteen, lines ten to twelve, of the Aug. 27, 2013 *voir dire* transcript, it should say: "We are going to find out what we are going to do.  Dance together or something like that."  *Id.* at 368.  The chronological case summary appearing in the record does not reflect that this motion was filed or that an order was entered on it.

[48] In reviewing a properly preserved claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). Whether a prosecutor's statement constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. *Id.* The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id.* When an improper argument is alleged to have been made, the correct procedure is to request the trial court to admonish the jury. *Id.* If the party is not satisfied with the admonishment, then he should move for mistrial. *Id.* Failure to request an admonishment or to move for mistrial results in waiver. *Id.*

[49] Where, as here, a claim of prosecutorial misconduct has not been properly preserved, our standard of review is different from that of a properly preserved claim. *Id.* More specifically, the defendant must establish not only the grounds for the misconduct, but also the additional grounds for fundamental error. *Id.* Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. *Id.* It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm." *Id.*

[50] Here, we cannot say that the portion of the *voir dire* transcript cited by Burton demonstrates any error, let alone fundamental error. To the extent Burton

suggests that the prosecutor attempted to prey on the emotions of a female juror who had admitted to knowing many people who lost their lives to drugs by stating "[w]ith all this speed we are going on a date by the way," we do not agree. In any event, we cannot say that such a statement rises to the level of prosecutorial misconduct, and certainly it did not make a fair trial impossible. We conclude that the prosecutor did not commit prosecutorial misconduct.

## VI.

The next issue is whether the evidence is sufficient to sustain Burton's convictions for aiding in dealing in methamphetamine and one count of dealing in a schedule IV controlled substance. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind.1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

Regarding his conviction for aiding in dealing in methamphetamine as a class B felony, Ind. Code § 35-38-4-1.1(a) provided at the time of the offense that "[a] person who: (1) knowingly or intentionally . . . (C) delivers . . . methamphetamine, pure or adulterated . . . commits dealing in

methamphetamine, a Class B felony . . . ."[9] Also, Ind. Code § 35-41-2-4 provides that "[a] person who knowingly or intentionally aids . . . another person to commit an offense commits that offense . . . ." The State charged Burton with "knowingly or intentionally aid[ing] in delivering Methamphetamine, pure or adulterated," on March 22, 2013.

[53] Burton argues that "[i]n this case, the evidence of the methamphetamine was questioned at trial and has since been released without notice to [Burton] or counsel." Appellant's Brief at 25. In support of his assertion that "the evidence of the methamphetamine was questioned at trial," Burton acknowledges that the State offered and the court admitted without objection two baggies containing methamphetamine. He argues that "Detective Katt testified under cross-examination that the field tests can sometimes be wrong," that "[t]he chemist . . . did not testify at the trial," and "[t]he State did not proffer a report from the Indiana State Police." *Id.* at 24.

[54] The facts favorable to Burton's conviction reveal that on March 22, 2013, CI-32 arranged to purchase methamphetamine for $120 from Burton at the Tearman Hotel in Franklin, Indiana, and informed Detective Wampler, who was assisted by Johnson County Narcotics Detective Damian Katt. Detective Wampler searched CI-32 prior to conducting the transaction, and CI-32 did not have any narcotics on his person. CI-32 was provided with $200 to purchase

---

[9] Subsequently amended by Pub. L. No. 158-2013, § 623 (eff. July 1, 2014); Pub. L. No. 168-2014, § 92 (eff. July 1, 2014); Pub. L. No. 226-2014(ts), § 7 (eff. July 1, 2014).

methamphetamine and potentially other drugs. Burton drove a white van into the hotel parking lot, and Jeremy Clark accompanied him in the front passenger seat. Burton told CI-32 to enter the driver's-side rear seat of the van, and CI-32 did so. Clark performed the hand-to-hand drug transaction with Burton. Both Detectives Wampler and Katt observed the transaction and video-recorded it, and the video was played for the jury. CI-32 returned to Detective Katt after leaving the van without leaving the sight of the detectives and handed Detective Katt two baggies containing a substance which the detectives identified as methamphetamine and which field tested positive for methamphetamine. CI-32 had eighty dollars remaining on his person.

[55] Based on the foregoing, we find that evidence of probative value exists from which the jury could have found Burton guilty of aiding in dealing in methamphetamine as a class B felony. To the extent Burton suggests that he raised a challenge as to the contents of the baggies, we note that the baggies were admitted without objection. Detective Katt testified that he had extensive training in narcotics, noting that he trained with the Indiana State Police drug enforcement section, with the "DEA up in Indianapolis for six months" in which he was "put on a narcotics investigation course," and that he "also went through advanced methamphetamine investigation school." Transcript at 324. Detective Katt further testified that he had seen methamphetamine "[h]undreds of times before" and field tested methamphetamine "[p]robably hundreds" of times, and the field test performed on the methamphetamine purchased on March 22, 2013 was performed correctly. *Id.* at 337. Moreover, Burton does

not cite to the record for the proposition that whether the baggies contained methamphetamine was at issue during the trial. We cannot say reversal is warranted on this basis. *See Halsema v. State*, 823 N.E.2d 668, 673 n.1 (Ind. 2005) (noting that "The identity of a drug can be proven by circumstantial evidence," that "[i]n the absence of expert testimony based on chemical analysis, this may include the 'testimony of someone sufficiently experienced with the drug indicating that the substance was indeed a dangerous drug,'" and that the officer who testified that the contents of a plastic bag was methamphetamine indicated that "he received special training concerning the production, manufacture, and distribution of methamphetamine"); *see also Doolin v. State*, 970 N.E.2d 785, 790 (Ind. Ct. App. 2012) (concluding that the police officer's experience, training, and personal observations, along with "other circumstantial evidence," "sufficiently established the identity of the substance as marijuana"), *trans. denied*.

[56] Burton also challenges the sufficiency of the evidence to convict him for dealing in a schedule IV controlled substance related to the second Xanax buy on April 17, 2013. At the time of the offense, the crime of dealing in a schedule IV controlled substance was governed by Ind. Code § 35-48-4-3, which provided in relevant part that: "(a) A person who: (1) knowingly or intentionally: . . . (C) delivers . . . a controlled substance, pure or adulterated, classified in schedule IV . . . commits dealing in a schedule IV controlled substance, a Class C felony." The State charged Burton with knowingly delivering Alprazolam, also known as Xanax, which is listed in schedule IV. Thus, to convict Burton of dealing in

a schedule IV controlled substance, the State needed to prove that Burton knowingly delivered Xanax.

[57] Burton argues that "[t]he video shows the drug deal is not clearly visible from the standpoint of the camera man." Appellant's Brief at 25. He also contends that in the video Detective Katt asks CI-32 to count the pills and CI-32 responds that there were twenty pills, but that "by the time the case went to trial, there were only eighteen pills." *Id.* at 26. Burton argues that "[t]his is remarkable because the property room voucher for the April 17, 2013 Xanax indicates a quantity of '20' but the Indiana State Police Laboratory report indicates 'eighteen.'" *Id.*

[58] The evidence favorable to the jury's verdict reveals that on April 17, 2013, CI-32 called Burton and asked whether he had any prescription medications available for purchase, and Burton responded that he could obtain Xanax from his sister, who had a prescription for the pills. Burton later called CI-32 and said that he could obtain twenty tablets for three dollars per tablet, explaining the price by saying that his sister named the price for the pills and was "taxing" on the sale, which is a term used to explain a high price. Transcript at 214. CI-32 agreed to pay the money, and Burton told CI-32 the address where they could meet.

[59] CI-32 was searched and subsequently provided with sixty dollars in buy money and a keil, for which Detective Wampler had the keil receiver. Detective Katt drove CI-32 to the house and saw Burton sweeping inside the garage, and

Detective Wampler parked in a separate vehicle one street over to listen to the purchase occur via monitoring equipment and watch the vehicle arrive at the residence. Detective Katt observed CI-32 enter the garage, pick up a small paper-wrapped package lying on a table, and hand money to Burton. CI-32 returned to the vehicle and handed the package to Detective Katt, which contained twenty pills and which Detective Katt recognized, based on having seen such pills "thousands of times," to be Xanax, also known as Alprazolam. *Id.* at 382. Detective Wampler also confirmed the identity of the pills by checking their identification with drugs.com and the Drug ID Bible. Burton's arguments on appeal invite us to reweigh the evidence presented at trial, which we cannot do. *See Jordan*, 656 N.E.2d at 817. Based upon our review of the evidence as set forth in the record and above, we conclude that sufficient evidence exists from which the jury could conclude that Burton was guilty beyond a reasonable doubt of dealing in a schedule IV controlled substance.

## *Conclusion*

For the foregoing reasons, we affirm Burton's convictions for dealing in a schedule II controlled substance as a class B felony, aiding in dealing in methamphetamine as a class B felony, and two counts of dealing in a schedule IV controlled substance as class C felonies.

Affirmed.

Barnes, J., and Bradford, J., concur.